SITQ et al. v. Reata et al.

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-01-405-CV

SITQ E.U., INC., SITQ HOLDINGS APPELLANTS

(U.S.), INC., CANDEREL CORP., AND 

JONATHAN WENER

V.

REATA RESTAURANTS, INC., APPELLEES

REATA RESTAURANTS MANAGEMENT 

CO., LTD., LAW, SNAKARD & 

GAMBILL, P.C., MARVIN E. BLUM & 

ASSOCIATES, P.C., AND RANGE 

RESOURCES CORPORATION

------------

FROM THE 348
TH
 DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

I.  Introduction

In this interlocutory appeal, SITQ E.U., Inc., SITQ Holdings (U.S.), Inc., Canderel Corp., and Jonathan Wener (collectively, appellants) appeal the trial court’s denial of their special appearance motions challenging the trial court’s exercise of personal jurisdiction over them.  Because we conclude that appellants had sufficient contacts with Texas to support the exercise of specific jurisdiction, we will affirm.

II.  Background Facts & Procedural History

SITQ E.U., Inc. is a Canadian corporation that owns 100% of SITQ Holdings (U.S.), Inc.
(footnote: 1)  SITQ Holdings is a Delaware corporation.  Canderel Corp. is a Delaware corporation.  Wener owns 100% of the entity that wholly owns Canderel, and he is the chairman, CEO, and sole director of Canderel and its parent company.  At all times pertinent to this case, Wener controlled Canderel either directly or indirectly.  

In the late 1990s, SITQ Holdings, Wener, Canderel, and Ronald Cherry, a Texas resident, made a conscious decision to acquire real estate in Texas.  Pursuant to this plan, Wener, Jean-Francios Fournier, an asset manager for SITQ EU and SITQ Holdings, and other representatives of SITQ Holdings came to Texas to view real estate before purchasing it.  One piece of real estate that they inspected was the Bank One Tower (the Tower) in Fort Worth.  

Loutex Portfolio GP, Inc.,
(footnote: 2) SITQ Holdings, Canderel, and CW Dalcan Investments, Inc.
(footnote: 3) formed Loutex Portfolio LP (Loutex Portfolio) to “acquire . . . , lease, manage, maintain, finance and sell” real estate in Texas, Louisiana, and Oklahoma, including the Tower.  

Loutex Portfolio had two limited partners:  SITQ Holdings and Canderel/Dalcan Investments.  SITQ Holdings owned 90% of Loutex Portfolio.  Initially, Dalcan Investments owned the other 10%, but Canderel became the successor in interest to Dalcan Investments and agreed to be bound by the Loutex Portfolio partnership agreement.  
Thereafter, Canderel and Dalcan Investments were deemed to be one limited partner and spoke with one voice regarding decisions or representations concerning Loutex Portfolio.  

In the fall of 1998, Loutex Portfolio purchased the Tower with funding provided by SITQ EU.  Loutex Portfolio did not, however, directly own the real property it acquired.  Instead, it created Loutex Fort Worth LP (Loutex FW), which Loutex Portfolio controlled, to acquire the title to the Tower. 

Loutex FW was run by a board of managers, which was comprised of Cherry, Yvon Tessier, and Helene Lafond.  These same three individuals made up the board of directors for Loutex Portfolio.  Tessier and Lafond were employed by SITQ, Inc., which performed all acts for SITQ EU and SITQ Holdings pursuant to a management contract.
(footnote: 4)  Tessier and Lafond were appointed to the Loutex entities’ boards by SITQ Holdings; Cherry was appointed by Canderel.  

On March 28, 2000, a tornado severely damaged the Tower.  At that time, Reata Restaurants, Inc., Reata Restaurants Management Co., Ltd., Law, Snakard & Gambill, P.C., Marvin E. Blum & Associates, P.C., and Range Resources Corporation (collectively, appellees) were tenants of the Tower.  Section 9.01 of appellees’ leases provided that, if the building was damaged by fire or other casualty, the landlord had the election either “to terminate this Lease or to repair same with reasonable dispatch.”  Section 9.02 of the lease provided that “[i]f Landlord elects to repair and reconstruct as provided in 
Section 9.01
 hereof, Landlord shall use its reasonable efforts to effect such repairs and reconstruction in such a manner as not to unreasonably interfere with Tenant’s occupancy.”  

After the March 28 tornado, appellees were informed, through Cherry and others, that the Tower would be repaired and reopened for occupancy as soon as possible.  Monthly updates on the Tower reconstruction were published to Tower tenants in the April through July 2000 editions of the 
Tower Talk
 newsletter.  In addition, Cherry and/or Loutex assisted Reata with restoration of the Reata restaurant so that it could reopen in early May 2000. 

By July 20, 2000, however, the Loutex entities, SITQ Holdings, and Canderel reached a settlement agreement with the Tower’s insurance company.  As a result of that settlement agreement, reconstruction on the Tower was stopped, all of the tenants’ leases were terminated, and the Tower was eventually sold.  

Thereafter, appellees sued appellants,
(footnote: 5) the Loutex entities, and Cherry for fraud, negligent misrepresentation, tortious interference, breach of fiduciary duty, conspiracy, conversion, denuding, and fraudulent transfers.
(footnote: 6)  Appellants filed special appearances challenging the trial court’s personal jurisdiction over them.  After a hearing, the trial court overruled the special appearances, and this appeal followed.  

III.  Issues Presented

In their first issue, appellants contend that the trial court’s exercise of personal jurisdiction over them is improper because they lack the requisite minimum contacts with Texas.  They assert there is no evidence that they purposefully engaged in business in Texas with regard to the Tower or its tenants; had any dealings or contacts with appellees; or had any other contacts with Texas that were sufficient to permit the trial court’s exercise of specific jurisdiction over them.  Appellants also argue that the fiduciary shield doctrine protects Wener from the trial court’s exercise of personal jurisdiction over him because any contacts he had with Texas were only in his capacity as a representative of Canderel.  

Appellees contend that each of the appellants had sufficient contacts with Texas to make them amenable to suit here, including the commission of a tort in whole or in part in Texas.  Appellees assert that their tort claims against appellants for fraud, negligent misrepresentation, tortious interference, conspiracy, conversion, denuding, and fraudulent transfers all arose out of appellants’ post-tornado conduct concerning the Tower and its tenants. 

IV.  Standard of Review

Whether a trial court has personal jurisdiction over a defendant is a question of law.  
BMC Software Belgium, N.V. v. Marchand,
 83 S.W.3d 789, 794 (Tex. 2002); 
Hotel Partners v. Craig,
 993 S.W.2d 116, 120 (Tex. App.—Dallas 1994, writ denied).  The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute.  
Marchand,
 83 S.W.3d at 793; 
McKanna v. Edgar,
 388 S.W.2d 927, 930 (Tex. 1965).  A defendant who challenges a trial court’s exercise of personal jurisdiction through a special appearance bears the burden of negating all jurisdictional bases.  
Kawasaki Steel Corp. v. Middleton,
 699 S.W.2d 199, 203 (Tex. 1985); 
Fish v. Tandy Corp.,
 948 S.W.2d 886, 891 (Tex. App.—Fort Worth 1997, writ denied).

When reviewing an order granting or denying a special appearance, we review all of the evidence.  
Fish,
 948 S.W.2d at 892.  Where, as here, the trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all fact findings necessary to support the judgment are implied.  
Marchand,
 83 S.W.3d at 795; 
Worford v. Stamper,
 801 S.W.2d 108, 109 (Tex. 1990); 
Fish,
 948 S.W.2d at 892.  Because the appellate record includes both the clerk’s and reporter’s records, however, these implied findings are not conclusive; we review the trial court’s resolution of disputed fact issues for both legal and factual sufficiency and the trial court’s legal conclusions de novo.  
Marchand,
 83 S.W.3d at 795.  We must affirm the trial court’s ruling on jurisdiction if we can uphold it on any legal theory supported by the evidence, regardless of whether the trial court articulated the correct reason for the ruling.  
Fish,
 948 S.W.2d at 892; 
see also Marchand,
 83 S.W.3d at 794 (stating that if trial court’s conclusion of law is erroneous, but trial court rendered proper judgment, erroneous legal conclusion does not require reversal).

V.  Personal Jurisdiction

A.  Texas Long-Arm Statute and Due Process

The Texas long-arm statute governs the Texas courts’ exercise of personal jurisdiction over nonresident defendants.  
Tex. Civ. Prac. & Rem. Code Ann. 
§§ 17.041-.045 (Vernon 1997 & Supp. 2003); 
Marchand,
 83 S.W.3d at 795.  The statute permits Texas courts to exercise jurisdiction over a nonresident defendant who “does business” in the state, including by the commission of a tort, in whole or in part.  
Tex. Civ. Prac. & Rem. Code Ann. 
§ 17.042; 
Marchand,
 83 S.W.3d at 795.  The list in section 17.042 is not exhaustive, however, and the Supreme Court of Texas has held that the long-arm statute extends Texas courts’ personal jurisdiction as far as the requirements of federal due process will allow.  
Marchand,
 83 S.W.3d at 795; 
U-Anchor Adver., Inc. v. Burt,
 553 S.W.2d 760, 762 (Tex. 1977), 
cert. denied,
 434 U.S. 1063 (1978).

Due process is satisfied when  (1) the defendant has established minimum contacts with the forum state (2) such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.  
Int’l Shoe Co. v. Washington,
 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945).  Because of the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system, the minimum contacts analysis is particularly important when the defendant is from a different country.  
Asahi Metal Indus. Co. v. Superior Court,
 480 U.S. 102, 114, 107 S. Ct. 1026, 1033 (1987); 
Marchand,
 83 S.W.3d at 795.

Under the minimum contacts analysis, we must determine whether the nonresident defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.  
Burger King Corp. v. Rudzewicz,
 471 U.S. 462, 474-75, 105 S. Ct. 2174, 2183 (1985).  The “purposeful availment” requirement ensures that a nonresident defendant will not be haled into a jurisdiction based solely upon random, fortuitous, or attenuated contacts or the unilateral activity of another party or a third person.  
Id.
 at 475, 105 S. Ct. at 2183; 
Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,
 815 S.W.2d 223, 226 (Tex. 1991).

Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established minimum contacts with the forum state.  
Guardian Royal,
 815 S.W.2d at 227.  Foreseeability is not an independent component of the minimum contacts analysis, but is implicit in the requirement that there be a “substantial connection” between the nonresident defendant and Texas arising from the action or conduct of the nonresident defendant purposefully directed towards Texas.  
Id.
  Individuals must have fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign.  
Burger King,
 471 U.S. at 472, 105 S. Ct. at 2182; 
Guardian Royal,
 815 S.W.2d at 226
; 
see also World-Wide Volkswagen Corp. v. Woodson,
 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980) (holding that the foreseeability critical to due process “is that the defendant’s conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there”).

B.  Specific v. General Jurisdiction

Personal jurisdiction exists if the nonresident defendant’s minimum contacts give rise to either specific jurisdiction or general jurisdiction.  
Helicopteros Nacionales de Colombia, S.A. v. Hall,
 466 U.S. 408, 413-14 & nn. 8-9, 104 S. Ct. 1868, 1872 & nn. 8-9 (1984); 
Guardian Royal,
 815 S.W.2d at 227.  Specific jurisdiction is established if the nonresident defendant’s alleged liability arises from or is related to the defendant’s purposeful contact with the forum.  When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship among the defendant, the forum, and the litigation.  
Guardian Royal,
 815 S.W.2d at 227-28.

It is not necessary that a nonresident defendant’s conduct actually occur in Texas, as long as the defendant’s acts were purposefully directed towards the state.  
Calder v. Jones,
 465 U.S. 783, 789-90, 104 S. Ct. 1482, 1487 (1984); 
CSR Ltd. v. Link,
 925 S.W.2d 591, 595 (Tex. 1996) (orig. proceeding); 
Whalen v. Laredo Nat’l Bancshares, Inc.
, 37 S.W.3d 89, 92 (Tex. App.—San Antonio 2000, pet. denied), 
disapproved on other grounds by
 
BMC Software Belgium, N.V. v. Marchand,
 83 S.W.3d 789 (Tex. 2002).  “[A] defendant should reasonably anticipate being haled into court where the effects of its conduct have been intentionally caused through the purposeful direction of activity toward the forum state, even if the defendant never physically enters the state.”  
Cole v. The Tobacco Inst.,
 47 F. Supp. 2d 812, 815 (E.D. Tex. 1999).

VI.  Specific Jurisdiction—Minimum Contacts Analysis

A.  Appellees’ Allegations of Jurisdictional Facts

To support the trial court’s exercise of jurisdiction over appellants, appellees asserted the following jurisdictional facts with respect to their tort claims:  

The Loutex entities, SITQ Holdings, and Canderel entered into a settlement agreement with the Tower’s insurer relating to the March 2000 tornado, and the insurer paid $80 million in settlement proceeds.  Loutex FW transferred a substantial portion of the settlement proceeds to each of the appellants.  The transfers, which were the result of a conspiracy among appellants, were fraudulent and denuded Loutex FW of its assets, leaving appellees and others who had claims against Loutex FW without recourse for payment.  

Appellants conspired with the Loutex entities and Cherry to commit conversion by agreeing, for their own benefit, to pursue a course of action pursuant to which they received and distributed the insurance proceeds to the exclusion of appellees’ rights to an interest in the proceeds.  

For their personal benefit, appellants conspired with Cherry to interfere, and tortiously interfered, with the contractual relationship between Loutex FW and appellees by causing Loutex FW to terminate their leases, or by preventing Loutex FW from continuing to repair and reconstruct the Tower, as it had elected to do under the leases.  Appellants acted in concert with Cherry to cause Loutex FW to breach the leases so that appellants could reap the windfall of collecting the insurance proceeds without spending them.  

Acting by and through Cherry, appellants made, and caused Loutex FW to make, various misrepresentations to appellees that the Tower would be reconstructed by Loutex FW, which appellees relied on to their detriment.  Appellees knew the representations were false, or made with an intent not to perform, or that the misrepresentations were recklessly or negligently made.  

Appellants do not contend that appellees failed to allege sufficient jurisdictional facts with regard to all of their causes of action.  Thus, without listing the elements of each of appellees’ claims, we hold that appellees alleged sufficient jurisdictional facts to support one or more of their claims against appellants, including the claims for tortious interference with contract, conspiracy to tortiously interfere,
(footnote: 7) and fraudulent transfers.
(footnote: 8)  Appellants’ complaints center primarily around whether there is sufficient evidence to establish these alleged minimum contacts; therefore, we turn to the evidence pertinent to appellees’ jurisdictional allegations.

B.  Evidence Relevant to Minimum Contacts

There is conflicting evidence about appellants’ activities concerning the Tower and its tenants following the March 2000 tornado.  Cherry testified at the special appearance hearing that to the best of his knowledge, only Loutex FW and Loutex Portfolio voted on whether to accept the insurance settlement and sell the Tower and that neither the SITQ entities nor Canderel did anything to interfere with the performance of the Tower tenants’ lease contracts.  Tessier testified that the SITQ entities and Canderel did not have the authority to cancel or modify the sale of the Tower.  Tessier further testified that neither SITQ EU nor SITQ Holdings had any right of control over Loutex FW’s decision-making, nor did the SITQ entities attempt to exercise any right of control over Loutex FW’s decisions following the tornado.  Cherry testified that Canderel did not directly participate in, or make, the decisions to accept the insurance settlement or to terminate the tenants’ leases.  

Tessier was involved in the decision-making process with respect to the Tower, but there is conflicting evidence concerning the capacity in which he made those decisions.  In addition to serving on boards of the Loutex entities, Tessier was a member of SITQ Holdings’ board of directors and a first vice president of SITQ EU, and he oversaw the SITQ entities’ investments around the world.  Tessier stated by affidavit that all of his dealings with Texas regarding the Tower were in his capacity as a member of the Loutex entities’ boards of managers, yet he signed the insurance settlement agreement on behalf of both the Loutex entities and SITQ Holdings.  

After the tornado, Jean-Francios Fournier traveled to Texas to look at the Tower.  Fournier was an asset manager for the SITQ entities and oversaw their investments in the United States.  He was also a vice president for Loutex Portfolio’s general partner.  Tessier testified at the special appearance hearing and by affidavit that the Loutex entities’ boards of managers asked Fournier to follow the aftermath of the tornado and report to them.  Tessier stated that all of Fournier’s trips to and communications with Texas regarding the Tower were as a representative of the Loutex entities’ boards.  As discussed below, however, there is evidence that Fournier also acted on the SITQ entities’ behalf concerning the Tower.

In addition, there is other evidence that after the tornado appellants played an active role in the decision-making process with respect to the Tower and its tenants.  For example, although the decisions for the Loutex entities were made by their three-member boards of managers, Tessier conceded that the boards did not make their decisions without consulting someone from SITQ Holdings.  Tessier also acknowledged that SITQ Holdings, Loutex Portfolio, and Loutex FW existed only to hold the real estate that was acquired in Texas and that they operated as a single business enterprise.  Further, Cherry was responsible for keeping SITQ Holdings and Canderel informed of developments, through Fournier and Wener, and there is evidence that he had to obtain Fournier’s and Wener’s approval before accepting the settlement from the insurance company and disposing of the Tower.  

In a series of emails from May through July 2000, Tessier, Fournier, Wener, and Cherry discussed the ongoing negotiations with the insurance company and their options if no settlement was reached.  On May 31, Cherry emailed Fournier, asking him whether “SITQ” agreed to Cherry’s recommendation regarding reconstruction of the Tower.  

On June 12, Cherry advised Fournier and Wener of the strategy that Loutex Portfolio’s board of managers had developed for dealing with the insurance company, which would involve giving the insurance company the opportunity to offer a “walk-away” price for the building rather than paying for reconstruction.  Wener understood “walk-away” to mean that the Tower would not be rebuilt.  Cherry wanted to explain everything to Fournier by telephone and “be in full agreement with you before we execute the critical pieces” at a June 16 meeting in Montreal, Canada, with the insurance company.  Fournier and Wener “permitted [the walk-away strategy] to go forward.”  

On June 16, 2000, Fournier, Tessier, Cherry, Wener, and several others met with the insurance company in Montreal to discuss their options concerning the Tower, including the walk-away strategy.  In a June 27 email to Fournier, Wener, and Tessier, Cherry referenced these four individuals’ agreement that the insurance company would only receive guidance as to a settlement amount from Cherry, but promised to “reserve final approvals for you.”  In response, Wener urged Fournier and Tessier to support Cherry fully and defer to him “to maximize our [insurance] settlement” and “ensure our mutual best interests.”

On July 5, 2000, Tessier, Fournier, and Cherry met again with the insurance company in Dallas to discuss their options, including a settlement amount.  Cherry represented Canderel at the July 5 meeting.  Cherry was also Wener’s designated representative with regard to voting on the insurance settlement, and he was obligated to vote in accordance with what Wener wanted.  

On July 7, Fournier informed Cherry of the minimum amount that SITQ would accept in settlement, and Cherry later reported that he had countered the insurance company’s settlement offer based on this information “as a strategy previously agreed upon with SITQ.”  Cherry also recommended to Fournier and Wener that the Tower be reconstructed if he was unable to negotiate an insurance settlement.  

In June and July 2000, while Cherry, Fournier, Tessier, and Wener were pursuing the walk-away strategy with the Tower’s insurer, Loutex FW, through Cherry and others, continued to represent to the Tower tenants that the Tower would be repaired and reopened for occupancy.  Monthly updates on the Tower reconstruction were published to the Tower tenants in the April through July editions of the 
Tower Talk
 newsletter.  The July 20, 2000 edition of 
Tower Talk
 informed tenants that:

We are still on the schedule reported last week in regards to our projected dates for floors 18, 23, 26, 27 and 29.  We are hoping to have several more floors ready by September 30
th
.  You will be notified as soon as we have carpet delivery dates, so that you can plan your move.

. . . .

. . . 
When the renovation is finished, you will virtually be in a brand new building, more beautiful, more energy efficient, and we will be able to eliminate concerns regarding indoor air quality.
  

In his capacity as asset manager for Loutex FW, Cherry was responsible for these communications and their content.  But the communications were initiated because Loutex Portfolio and the SITQ entities wanted the tenants to be informed about what was happening with regard to the Tower.  The SITQ entities knew the Tower tenants would rely on these communications, and Cherry was responsible for keeping the SITQ entities’ asset manager (Fournier) informed of what was going on.  Cherry also communicated with Fournier and Wener by email concerning what “we” (he, Fournier, and Wener) had done to notify the Tower tenants concerning reconstruction.  

By July 20, 2000, however, the Loutex entities, Canderel, and SITQ Holdings had reached a settlement agreement with the insurance company concerning the Tower.  Cherry, Lafond, and Tessier signed the agreement on behalf of Loutex FW and Loutex Portfolio; Tessier and Fournier signed on behalf of SITQ Holdings; and Douglas Pascal, Canderel’s president, signed on behalf of Canderel.  The settlement agreement was governed by Texas law.  The $80 million in settlement proceeds was distributed primarily to SITQ EU, SITQ Holdings, Canderel and/or Wener, Cherry, and CW Dalcan Management Services, a company jointly owned by Cherry and Canderel or Wener.  Loutex Portfolio reserved $11 million of the proceeds.  

SITQ EU, through SITQ Holdings, approved the insurance settlement and authorized the sale of the Tower.  An officer of SITQ EU, through SITQ Holdings, was also authorized to act jointly with the Loutex entities to negotiate and execute any documents and take any other action they considered appropriate in order to give effect to SITQ EU’s resolution approving the insurance settlement.  

There is also evidence that the SITQ entities authorized Cherry to speak on their behalf concerning their decisions to (1) terminate the tenants’ leases, (2) not proceed with reconstruction of the Tower, and (3) market the Tower for resale or demolish it.
(footnote: 9)  Cherry was instructed to say that it was “not economically feasible to restore the building to the standards of safety which we believe are necessary for our tenants[;] therefore we are releasing the tenants from their lease obligations so that they may pursue the leasing of other premises to continue their businesses.”  He was also responsible for contacting the tenants who would most likely be angry about the lease terminations, in order to mitigate the potential for litigation.  

All of this evidence shows that each of the appellants purposefully directed activities towards Texas with regard to the Tower and its tenants and that appellants intended, or at a minimum knew, that the tenants would be adversely affected by these activities—while appellants stood to reap significant financial benefits.  Although there is conflicting evidence concerning who actually made the decision to implement the walk-away strategy rather than reconstructing the Tower, the evidence is legally and factually sufficient to support the trial court’s implied finding that appellants participated in that decision.

C.  Fiduciary Shield Doctrine

Despite Wener’s contacts with Texas, appellants assert that he is protected by the fiduciary shield doctrine from the trial court’s exercise of jurisdiction over him because his only contacts were as Canderel’s representative.  

The fiduciary shield doctrine protects a corporate officer or employee from the trial court’s exercise of general jurisdiction over him when all of the individual’s contacts with Texas were on behalf of the employer.  
See Siskind v. Villa Found. for Educ., Inc.,
 642 S.W.2d 434, 438 (Tex. 1982) (“Absent some allegation of a specific act in Texas, or one with reasonably foreseeable consequences within this state’s borders, a nonresident employee of a foreign corporation cannot be sued in Texas simply because his or her employer solicits business here.”); 
Royal Mortgage Corp. v. Montague,
 41 S.W.3d 721, 738 (Tex. App.—Fort Worth 2001, no pet.) (noting general rule that court may not assert personal jurisdiction over individual based on individual’s relation to corporation unless corporation is individual’s alter ego).  Courts that have applied the fiduciary shield doctrine, however, have limited its application to attempts to exercise 
general
 jurisdiction over a nonresident defendant.  
Brown v. Gen. Brick Sales Co.,
 39 S.W.3d 291, 300 (Tex. App.—Fort Worth 2001, no pet.); 
see also Garner v. Furmanite Australia Pty., Ltd.,
 966 S.W.2d 798, 803 (Tex. App.—Houston [1
st
 Dist.] 1998, pet. denied) (holding that fiduciary shield doctrine protected Australian resident from trial court’s exercise of general jurisdiction when his only contacts with Texas were on his employer’s business).

A corporate officer or employee is not shielded from the exercise of 
specific
 jurisdiction as to torts for which the officer or employee may be held individually liable.  
Tuscano v. Osterberg,
 82 S.W.3d 457, 467-68 (Tex. App.—El Paso 2002, no pet.); 
see also Calder,
 465 U.S. at 790, 104 S. Ct. at 1487 (holding that reporter and editor of allegedly defamatory magazine article were subject to personal jurisdiction); 
Gen. Elec. v. Brown & Ross Int’l Distribs., Inc.
, 804 S.W.2d 527, 532-33 (Tex. App.—Houston [1
st
 Dist.] 1990, writ denied) (holding that corporate officers who had personally arranged theft of design plans, ordered counterfeit and mislabeled parts, and made misrepresentations to customers were subject to personal jurisdiction in Texas).  While individuals’ contacts with a forum are not to be analyzed based on their employer’s activities in that forum, “their status as employees does not somehow insulate them from jurisdiction.”  
Calder,
 465 U.S. at 790, 104 S. Ct. at 1487.  There is no blanket protection from jurisdiction simply because a defendant’s alleged acts were done in a corporate capacity.  
D.H. Blair Inv. Banking Corp. v. Reardon,
 97 S.W.3d 269, 277 (Tex. App.—Houston [14
th
 Dist.] 2002, pet. filed) (op. on reh’g); 
Brown,
 39 S.W.3d at 300.  Instead, “[e]ach defendant’s contacts with the forum State must be assessed individually.”  
Calder,
 465 U.S. at 790, 104 S. Ct. at 1487.

Corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation.  
Shapolsky v. Brewton,
 56 S.W.3d 120, 133 (Tex. App.—Houston [14
th
 Dist.] 2001, pet. denied).  Further, if a corporate officer knows that the brunt of the alleged tort will be felt by a particular resident in the forum, he must reasonably anticipate being haled into court there to answer for his actions.  
Id.
 at 134.

Appellees alleged that the trial court had specific jurisdiction over Wener based on tortious activities that he purposefully directed towards Texas, and the record supports appellees’ jurisdictional allegations.  In mid-June 2000, Wener was aware of the “walk-away” strategy involving the Tower, and he permitted the strategy to go forward, even though he knew that it would mean the Tower would not be rebuilt and the tenants’ leases would be terminated.  Wener met with the insurance company to discuss the options concerning the Tower, including the walk-away strategy.  He also directed Cherry, as his designated representative, to vote in favor of the insurance settlement.  This evidence shows that Wener had sufficient minimum contacts with Texas to support the exercise of specific jurisdiction over him individually, even if all of his activities directed towards Texas were done in his capacity as Canderel’s chairman, CEO, and sole director.  Accordingly, the trial court properly concluded that Wener was not protected from jurisdiction by the fiduciary shield doctrine.

D.  Cherry’s Agency

Appellants contend that Cherry’s conduct cannot be imputed to them for jurisdictional purposes because there is no evidence that Cherry was their agent.  An agent is a person who is authorized to act for another and is subject to the control of the other.  
Royal Mortgage Corp.,
 41 S.W.3d at 732.  An agency relationship may be implied from the parties’ conduct.  
Orozco v. Sander,
 824 S.W.2d 555, 556 (Tex. 1992); 
Royal Mortgage Corp.,
 41 S.W.3d at 732.

There is legally and factually sufficient evidence to support the trial court’s implied finding that Cherry acted as appellants’ agent, at least with regard to the insurance settlement.  Cherry testified at the special appearance hearing that he had never acted or been authorized to act on behalf of the SITQ entities; that he was controlled solely by the Loutex entities’ boards of managers;
(footnote: 10) and that whenever he had any specific dealings with Lafond or Tessier, he understood them to be acting as members of these boards.  There is other evidence, however, that Cherry was subject to appellants’ control with regard to the decision of whether to settle with the insurance company or proceed with reconstructing the Tower.  Although Cherry was the only person to negotiate with the insurance company concerning a settlement amount, this was by agreement with Fournier, Wener, and Tessier, who had the right of final approval.  Further, Cherry’s counter-proposal to the insurance company’s settlement offer was based on what Fournier, the SITQ entities’ asset manager,
(footnote: 11) told Cherry SITQ would accept and was pursuant to “a strategy previously agreed upon with SITQ.”  In addition, Cherry acknowledged at the special appearance hearing that, as Canderel’s appointee to the Loutex boards, he was obligated to vote in accordance with what Wener wanted regarding the insurance settlement, and there is evidence that Wener controlled Canderel.

Although the evidence regarding who controlled Cherry’s actions is conflicting, the trial court, as finder of fact, was free to resolve any inconsistencies in support of its implied finding that Cherry acted as appellants’ agent concerning the insurance settlement.  
See McGalliard v. Kuhlmann,
 722 S.W.2d 694, 697 (Tex. 1986) (holding that trier of fact may believe one witness, disbelieve others, and resolve inconsistencies in their testimony)
; Royal Mortgage Corp.,
 41 S.W.3d at 733 (noting that question of agency is generally one of fact).
(footnote: 12)
E.  Fair Warning

We now turn to the issue of whether appellants had fair warning that their contacts with Texas might subject them to jurisdiction in this state.  We conclude that they did.  Appellants’ activities directed towards the Tower and its tenants were such that appellants could reasonably have anticipated being haled into Texas court to defend a lawsuit arising out of their conduct.  Indeed, the SITQ entities’ authorization of, or acquiescence to, Cherry’s post-settlement contacts with the Tower tenants in order to mitigate the potential for litigation is evidence that appellants were well aware of the possibility that they might be called to defend against a lawsuit in Texas.  Moreover, the fact that most of Wener’s conduct did not actually occur in Texas does not prevent the trial court’s exercise of personal jurisdiction over him.  Wener’s purposeful activities directed towards Texas and his knowledge of their adverse effect on the Tower tenants were such that he should have reasonably anticipated being haled into Texas court to answer for his conduct.  
See Shapolsky,
 56 S.W.3d at 134; 
see also Siskind,
 642 S.W.2d at 438 n.5 (stating that due process is satisfied if nonresident defendant’s activities outside of Texas have reasonably foreseeable consequences in the state, even if the defendant is not physically present).

F.  Relationship Between Appellants’ Minimum Contacts

and Appellees’ Claims

Finally, the relationship between appellants’ contacts with Texas and appellees’ claims is sufficient to support specific jurisdiction.  Appellees’ tort claims against appellants are directly related to appellants’ post-tornado conduct concerning the Tower and its tenants.  Where a plaintiff alleges a tort claim arising out of a purposeful act committed in or directed towards Texas, the necessary proof for jurisdictional purposes is only that the nonresident defendant committed the act.  
Ring Power Sys. v. Int’l De Comercio Y Consultoria,
 39 S.W.3d 350, 353 (Tex. App.—Houston [14
th
 Dist.] 2001, no pet.)
; 
Arterbury v. Am. Bank & Trust Co.,
 553 S.W.2d 943, 948 (Tex. Civ. App.—Texarkana 1977, no writ).

Here, for example, appellees alleged causes of action for tortious interference and conspiracy to tortiously interfere with their contractual relationship with Loutex FW arising out of appellants’ actions that resulted in the termination of appellees’ leases.  Appellees also alleged a cause of action for fraudulent transfers arising out of appellants’ receipt of the majority of the insurance settlement proceeds.  As we have discussed, the evidence shows that appellees’ lease agreements with Loutex FW were terminated as the direct result of an insurance settlement in which appellants actively participated—with full knowledge that settlement would result in termination of the leases and cessation of Loutex FW’s reconstruction efforts thereunder.  The evidence also shows that appellants received the majority of the settlement proceeds from Loutex FW so that those funds would not be available to satisfy appellees’ claims against Loutex FW.  Thus, the evidence shows that appellants committed the acts on which appellees’ claims against them are based.

VII.  Conclusion

For all of the foregoing reasons, we hold that appellants failed to carry their burden of negating all bases for the trial court’s exercise of personal jurisdiction over them.  
See CSR Ltd.,
 925 S.W.2d at 596.
(footnote: 13)  Accordingly, the trial court correctly concluded that appellants had sufficient minimum contacts with Texas to support specific jurisdiction.  We overrule appellants’ first issue and affirm the trial court’s order overruling appellants’ special appearances.
(footnote: 14)

JOHN CAYCE

CHIEF JUSTICE

PANEL A: CAYCE, C.J.; LIVINGSTON and WALKER, JJ.

DELIVERED: May 22, 2003

FOOTNOTES
1:
SITQ EU is wholly owned by Caisse de Depot, which is not a party to this case.  

2:
Loutex Portfolio GP is a Delaware corporation. 

3:
Dalcan Investments is a Texas entity wholly owned by Cherry. 

4:
For simplicity, we sometimes refer to Loutex Portfolio and Loutex FW as “the Loutex entities” and SITQ EU and SITQ Holdings as “the SITQ entities.”  Neither the Loutex entities nor the SITQ entities had any employees.  

5:
Only Reata sued SITQ EU.  

6:
The Loutex entities and Cherry are not parties to this appeal. 

7:
The elements of tortious interference with contract are:  (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) that proximately causes the plaintiff’s damages; and (4) actual damage or loss.  
Tex. Beef Cattle Co. v. Green,
 921 S.W.2d 203, 210 (Tex. 1996).
  The elements of conspiracy are:  (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.  
Massey v. Armco Steel Co.,
 652 S.W.2d 932, 934 (Tex. 1983).  We recognize that civil conspiracy between a resident and a nonresident, standing alone, cannot be the basis for jurisdiction.  
See Nat’l Indus. Sand Ass’n v. Gibson,
 897 S.W.2d 769, 773 (Tex. 1995).  Here, however, appellees’ allegations concerning conspiracy were based on activities that appellants directed towards Texas.

8:
A fraudulent transfer is one made by a debtor with the intent to hinder, delay, or defraud its creditors by placing the debtor’s property beyond the creditors’ reach.  
Tex. Bus. & Com. Code Ann. 
§ 24.005(a) (Vernon 2002); 
Nobles v. Marcus,
 533 S.W.2d 923, 925 (Tex. 1976).  Insolvency is an element of some, but not all, types of fraudulent transfers, and appellees do not contend that the transfers in this case rendered Loutex FW insolvent.  
See
 
Tex. Bus. & Com. Code Ann. 
§§ 24.005(a)
, 24.006.  Contrary to appellants’ assertion in their brief, a creditor may recover, 
from the transferee,
 judgment for the amount necessary to satisfy the creditor’s claim.  
See id. 
§§ 24.008(a)(1), 24.009(b)(1) (providing that, to the extent a fraudulent transfer is voidable, a creditor may recover a money judgment from the first transferee or the person for whose benefit the transfer was made); 
see also Eckert v. Wendel,
 120 Tex. 618, 40 S.W.2d 796, 797 (1931) (stating that defrauded creditor’s remedy against 
grantee
 of fraudulently conveyed real estate is suit to avoid conveyance)
.

9:
It is unclear from the record whether the SITQ entities authorized Cherry to speak on their behalf or whether they were simply aware of, and acquiesced to, Cherry’s communications and their content.  

10:
Cherry’s testimony that he was controlled by the Loutex entities’ boards is curious, given the fact that Cherry was himself a member of these boards. 

11:
Contrary to appellants’ assertion in their brief, Cherry did not testify that he understood Fournier to be acting on behalf of the Loutex entities’ boards.

12:
The evidence does not support a finding that Cherry made the alleged presettlement misrepresentations to the Tower tenants as appellants’ agent because there is no evidence that appellants controlled what Cherry told the tenants.  Although there is some evidence that Cherry’s presettlement communications were on behalf of appellants as well as the Loutex entities, and that Fournier and Wener knew of their content, this evidence does not establish agency.  
See Walker v. Fed. Kemper Life Assurance Co.,
 828 S.W.2d 442, 452 (Tex. App.—San Antonio 1992, writ denied) (holding that, even if person acts for another, agency does not exist if person is not under the other’s control as to means and details of accomplishing the task).

13:
Appellants’ arguments that they cannot be liable for fraudulent transfers merely attack the merits of this cause of action; they do not negate a basis for the trial court’s jurisdiction.  
See id.; see also
 
Ring Power Sys.,
 39 S.W.3d at 353
 (holding that trial court should rely only upon necessary jurisdictional facts and not reach merits of case when deciding whether to exercise or decline jurisdiction).

14:
In light of our holding that appellants had sufficient minimum contacts with Texas to support specific jurisdiction, we need not address appellants’ remaining issues.  In addition, we do not address whether the trial court’s exercise of specific jurisdiction comports with traditional notions of fair play and substantial justice because appellants do not raise any complaints based on this component of the jurisdictional equation.  
See
 
Tex. R. App. P.
 47.1 (providing that appellate court must only address issues necessary to final disposition of appeal).