Opinion issued May 4, 2006 



 















In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00567-CV
____________

TODD ESSE, Appellant

V.

BP AMERICA PRODUCTION COMPANY, Appellee
 

 
 
On Appeal from the 234th District Court 
Harris County, Texas
Trial Court Cause No. 2003-21829

 

 




 

 

AND

NO. 01-04-00832-CV
 

 

TODD ESSE, Appellant

V.

EMPIRE ENERGY III, LTD., Appellee
 

 
 
On Appeal from the 234th District Court
Harris County, Texas
Trial Court Cause No. 2003-21829
 



MEMORANDUM OPINION

          Appellant, Todd Esse (“Todd”), brings these accelerated interlocutory appeals



challenging the trial court’s orders denying his special appearance in each case.


 In
his sole issue in both cases, Todd contends that the trial court erred in denying his
special appearances because he lacks the minimum contacts with the State of Texas
necessary to establish personal jurisdiction. 
          We affirm the orders of the trial court denying Todd’s special appearances.
          Factual and Procedural Background 
          Appellee BP America Production Company (“BP”) is the owner of one-half of
the working interest in an oil and gas well located in Yoakum County, Texas, and is
also the operator of the well. Appellee Empire Energy, Ltd. (“Empire”) originally
owned the other one-half of the well’s working interest, but assigned one-half of its
working interest to Westgate Energy Partners, Inc. (“Westgate”). 
The BP Case
          BP sued Westgate for declaratory judgment and breach of contract, contending
that Westgate breached a joint operating agreement that required Westgate to pay
25% of the well’s drilling and completion costs. BP alleged that Todd, Westgate’s
majority shareholder, and Brent Esse (“Brent”), Todd’s father and Westgate’s
president, vice-president, secretary, treasurer, and sole director, organized and
operated Westgate “in such a manner that the corporate entity should be disregarded.”
BP also asserted fraud, fraudulent transfer, and conspiracy claims against Todd and
Brent in their individual capacities. 
          Todd, a Connecticut resident, filed a special appearance in the BP case.


 In his
special appearance, Todd asserted that the trial court lacked jurisdiction over him
because he is a nonresident and does not have sufficient minimum contacts with
Texas. As evidence in support of his special appearance, Todd testified, by affidavit,
that he (1) is not a resident of Texas and has not been a Texas resident for over nine
and one-half years; (2) is a Connecticut resident, (3) does not have or maintain a place
of business in Texas; (4) is not employed in Texas; (5) does not have any employees
or agents in Texas; (6) does not have and has never been required to have a registered
agent for service of process in Texas; (7) does not operate a business in Texas,
although he is affiliated as a shareholder of Westgate and has loaned money to
Westgate; (8) has not committed any tort, in whole or in part, in Texas; (9) is not and
has never been a director, officer, or employee of Westgate; (10) was not a party to
any contracts into which Westgate entered with respect to drilling operations
regarding the well; and (11) has never met with or spoken with representatives of
Empire or BP or any of their officers, agents, employees, partners, or representatives. 
          BP filed a response to Todd’s special appearance, asserting that the trial court
could exercise both specific and general jurisdiction over Todd. As a threshold
matter, BP contended that Todd’s special appearance was improper on its face
because it was not made by a properly sworn motion. In regard to the merits of
Todd’s special appearance, BP asserted that Todd had committed the torts of
negligent misrepresentation, fraud, and conspiracy in the formation and use of
Westgate, that Todd made negligent, fraudulent, and conspiratorial communications
to Brent, and that there was a strong nexus between “the alleged torts that occurred
in Texas and the contact with Texas.” 
          In support of its specific jurisdiction argument, BP cited testimony from Todd’s
and Brent’s depositions that establishes that (1) Todd is the majority shareholder of
Westgate, a Texas corporation; (2) Todd spoke, approximately once a month, by
telephone to his father, Brent, who lives in Houston, is a Texas resident, and is the
sole director and officer of Westgate; (3) Brent and Todd discussed the affairs of
Westgate during their monthly telephone conversations; (4) Todd loaned Westgate
$69,000 in a series of transactions over the course of several years and these loans
were made, at least in part, from Todd’s personal bank account; (5) the loan document
used by Todd for his loans to Westgate stated that it “shall be governed by the laws”
of Texas; (6) Brent “consulted” Todd regarding Westgate’s decision to sell one of
Westgate’s primary assets, the Mallet Land & Cattle prospect (the “Mallet prospect”);
(7) Todd warned Brent about the possibility that selling the Mallet prospect might
constitute a fraudulent conveyance since Westgate “was getting rid of assets when it
[was] being sued”; (8) Todd was a majority shareholder of 5E Oil and Gas (“5E”),
formerly known as Esse Oil & Gas, another Esse family-owned Texas corporation of
which Brent was the sole director and officer and Todd was the majority shareholder;
(9) Westgate was paying Todd’s legal bills in the defense of the BP case and the
Empire case; (10) Todd planned to write off the debt owed to him by Westgate; and
(11) Todd “guessed” he took a tax deduction on his 2002 tax return for the well.
          In support of its general jurisdiction arguments, BP produced the following
evidence of Todd’s alleged continuous and systematic contacts with Texas: (1) in
2001, Todd made a $100,000 loan to Image Energy, a Texas corporation, which was
guaranteed by Texas residents, and Todd paid attorneys from Texas to draft the loan
document; (2) Todd wrote a check from his personal account to Daniel Boone, who
is affiliated with Image Energy; (4) Todd had previously loaned money to his sister,
who was living in Texas; (5) in either 2000 or 2001, Todd loaned a Texas resident
money to purchase a home in Houston, and Todd secured a lien on the home; (6)
Todd travels to Texas on business for his current employer “maybe twice a month,
sometimes twice a year depending on business”; (7) Todd traveled to Texas for
pleasure around four times in the last two years; (8) Todd owns $250,000 worth of
stock in a Dallas-based technology company; (9) Todd has a brokerage account with
Southwest Securities, which is located in Georgetown, Texas, buys and sells publicly
traded securities through the account, and has paid the broker of this account; (10)
over the past two and one-half years, Todd has made wire transfers and loaned money
to 5E; (11) Todd has set up trust brokerage accounts in Texas for his three minor
children; (12) Todd had an “informal agreement” with Boone, a Texas resident, to
“evaluate some possible investments” in Texas, to counsel Todd about spending
money on those investments in Texas, and to make certain unidentified personal
contacts in Texas on his behalf; and (13) within the last ten years, Todd guaranteed
some loans for Michael Deane Homes, a home builder located in Austin, Texas. 
Moreover, BP asserted that exercising jurisdiction over Todd would not violate
traditional notions of fair play and substantial justice.
          At the special appearance hearing, the trial court sustained Todd’s special
appearance as to general jurisdiction, but reserved its ruling regarding specific
jurisdiction. The trial court subsequently denied Todd’s special appearance in a
written order. Todd did not request, and the trial court did not make, findings of fact
and conclusions of law. 
The Empire Case
          Empire’s claims against Todd, similar to those of BP, arose out of Empire’s
assignment of one-half of the well’s working interest to Westgate and Westgate’s
failure to pay its proportionate share of the well’s drilling costs pursuant to the joint
operating agreement and the assignment. Empire sued Westgate for breach of
contract, contending that Westgate breached its obligations under the operating
agreement and the assignment and bill of sale. Empire also sued Todd in his
individual capacity and asserted claims of fraud, breach of fiduciary duty, aiding and
abetting breach of fiduciary duty, usurpation of corporate opportunities and self
dealing, and fraudulent transfer. Finally, Empire, like BP, asserted that Westgate’s
corporate identity should be disregarded. 
          In support of its fraud claim, Empire alleged that Todd’s agents, with Todd’s
knowledge or approval, made material misrepresentations to Empire for purposes of
inducing Empire to enter contracts. In support of its breach of fiduciary duty claims
against Todd, BP asserted that, as a majority or controlling shareholder and/or
director of Westgate,


 Todd owed a fiduciary duty to Westgate and breached that
duty, to the detriment of Empire. Empire further asserted that Todd directly owed it
a fiduciary duty and that Brent’s breach of his fiduciary duty “would not have been
possible without the approval, encouragement, and financing provided by Todd.” In
support of its fraudulent transfer claim, Empire alleged, among other things, that
Westgate, with the knowledge of Brent and Todd, sold assets to 5E shortly after
receiving demands from Empire and BP for payment of the well’s drilling costs, that
Westgate’s assets, including the Mallet prospect, were sold with the intent to defraud
Westgate’s creditors, including Empire, and that Westgate sold its assets without
receiving reasonably equivalent value for the assets.
          Todd filed a special appearance in the Empire case that was nearly identical to
his special appearance filed in the BP case, and attached the same affidavit testimony
that he attached to his special appearance filed in the BP case. Empire filed a
response to Todd’s special appearance and, like BP, asserted that Todd was subject
to the general and specific jurisdiction of Texas courts. Empire cited essentially the
same contacts cited by BP in its response to Todd’s special appearance. Empire
emphasized the deposition testimony of Todd and Brent that established that Todd
had been a significant source of working capital for Westgate, that Todd loaned
money to Westgate from his personal brokerage account in Georgetown, Texas, and
that Todd was involved in the decision to sell Westgate’s assets following Westgate’s
receipt of demands from BP and Empire. 
          Empire specifically alleged that Boone, one of Westgate’s agents, negligently
misrepresented to Empire, “on behalf” of Brent and Todd, that Westgate had the
resources to pay its share of drilling costs for the well and that, after Westgate had
received demands from both BP and Empire, Brent and Todd concocted a plan to
transfer Westgate’s assets to 5E. In support of these fraudulent transfer allegations,
Empire cited Brent’s testimony that the Mallet prospect was transferred from
Westgate to 5E because of the threat of or the filing of the BP lawsuit. Brent further
testified that, during a telephone call placed by him from Texas to Todd, Todd
consented to the sale of Westgate’s assets to 5E. Brent also agreed that a significant
portion of the proceeds from the sale of Westgate’s assets to 5E was used to pay his
and Todd’s legal bills in defense of the BP and Empire cases. Empire also cited
Todd’s testimony, which established that although Todd and Brent discussed the
possibility that selling Westgate’s assets might constitute a fraudulent conveyance,
Todd ultimately agreed to sell the Mallet prospect “because BP and Empire were
owed money.” Todd also agreed that Westgate was paying his legal bills, and Todd
could not dispute evidence indicating that funds obtained from the sale of Westgate’s
assets to 5E were used to pay his legal bills in defense of the instant suits.
          The trial court subsequently denied Todd’s special appearance in a written
order. Todd did not request, and the trial court did not make, findings of fact and
conclusions of law. However, in its order, the trial court specifically stated that Todd
was not subject to the general jurisdiction of Texas courts, but that he was subject to
the specific jurisdiction of Texas courts.
Standard of Review
          The burden of proof is on a nonresident to negate all possible grounds for
personal jurisdiction. BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789,
793 (Tex. 2002); Wright v. Sage Eng’g, Inc., 137 S.W.3d 238, 248 (Tex.
App.—Houston [1st Dist.] 2004, pet. denied). The existence of personal jurisdiction
is a question of law, which we determine de novo. BMC Software Belgium, N.V., 83
S.W.3d at 794. “However, the trial court frequently must resolve questions of fact
before deciding the jurisdiction question.” Id. Where, as here, the trial court does not
issue findings of fact and conclusions of law with its special appearance ruling, “all
facts necessary to support the judgment and supported by the evidence are implied.” 
Id. at 795. When the appellate record contains the applicable trial record, these
implied factual findings are not conclusive, and an appellant may challenge them for
evidentiary sufficiency. Id. However, we apply a de novo review to the extent that
the underlying facts are undisputed. Preussag Aktiengesellschaft v. Coleman, 16
S.W.3d 110, 113 (Tex. App.—Houston [1st Dist.] 2000, pet. dism’d w.o.j.). 
Jurisdiction
          A court may assert personal jurisdiction over a nonresident defendant only if
the requirements of both the Fourteenth Amendment’s due process clause


 and the
Texas long-arm statute


 are satisfied. Helicopteros Nacionales de Colombia, S.A. v.
Hall, 466 U.S. 408, 413, 104 S. Ct. 1868, 1871–72 (1984); CSR Ltd. v. Link, 925
S.W.2d 591, 594 (Tex. 1996) (orig. proceeding). The Texas long-arm statute allows
a court to exercise personal jurisdiction over a nonresident defendant who does
business in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042. A nonresident
“does business” in Texas if he, among other things, “commits a tort in whole or in
part” in Texas. Id.


 The Texas long-arm statute reaches as far as the federal and state
constitutional guarantees of due process allow. CSR Ltd., 925 S.W.2d at 594. 
          The United States Constitution permits a state to exert personal jurisdiction
over a nonresident defendant only if the defendant has “some minimum, purposeful
contacts with the state, and the exercise of jurisdiction will not offend traditional
notions of fair play and substantial justice.” Dawson-Austin v. Austin, 968 S.W.2d
319, 326 (Tex. 1998). A nonresident defendant must have purposefully established
such minimum contacts with the forum that he could reasonably anticipate being sued
there. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 2183
(1985). A nonresident who has purposefully availed himself of the privileges and
benefits of conducting business in the foreign jurisdiction has sufficient contacts with
the forum to confer personal jurisdiction. CSR Ltd., 925 S.W.2d at 594. “The
exercise of personal jurisdiction is proper when the contacts proximately result from
actions of the nonresident defendant which create a substantial connection with the
forum state.” Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,
815 S.W.2d 223, 226 (Tex. 1991). “The substantial connection between the
nonresident defendant and the forum state necessary for a finding of minimum
contacts must come about by action or conduct of the nonresident purposefully
directed toward the forum state.” Id. It is the quality and nature of the contacts,
rather than their number, that is important. Id. at 230 n.11. A defendant, however,
should not be subject to the jurisdiction of a foreign court based upon random,
fortuitous, or attenuated contacts. Michiana Easy Livin’ Country, Inc. v. Holten, 168
S.W.3d 777, 785 (Tex. 2005); CSR Ltd., 925 S.W.2d at 595. Likewise, unilateral
actions by third parties claiming some relationship with the nonresident defendant do
not subject the nonresident defendant to the jurisdiction of a foreign court. Michiana
Easy Livin’ Country, Inc., 168 S.W.3d at 785; Am. Type Culture Collection v.
Coleman, 83 S.W.3d 801, 806 (Tex. 2002).
          A defendant’s contacts with a forum can give rise to either general or specific
jurisdiction. Guardian Royal, 815 S.W.2d at 227. General jurisdiction is present
when a defendant’s contacts are continuous and systematic, allowing the forum to
exercise personal jurisdiction over the defendant, even if the cause of action did not
arise from or relate to activities conducted within the forum state. Id. at 228; 
Schlobohm v. Schapiro, 784 S.W.2d 355, 357 (Tex. 1990). The minimum contacts
analysis is broader and more demanding when general jurisdiction is alleged,
requiring a showing of substantial activities in the forum state. Guardian Royal, 815
S.W.2d at 228. Specific jurisdiction, however, is established if the defendant’s
alleged liability arises from or is related to an activity conducted within the forum. 
Id. at 228. When specific jurisdiction is asserted, the minimum contacts analysis
focuses on the relationship among the defendant, the forum, and the litigation. Id. at
227.
          Although not determinative, foreseeability is an important consideration in
deciding whether the nonresident defendant has purposefully established minimum
contacts with the forum state. Burger King, 471 U.S. at 474, 105 S. Ct. at 2183;
Guardian Royal, 815 S.W.2d at 227. “[T]he concept of foreseeability is implicit in
the requirement that there be a ‘substantial connection’ between the nonresident
defendant and Texas arising from action[s] or conduct of the nonresident defendant
purposefully directed toward Texas.” Guardian Royal, 815 S.W.2d at 227.
          Finally, we note that “[o]n reaching a decision to exercise or [to] decline
jurisdiction based on the defendant's alleged commission of a tort, the trial court
should rely only on the necessary jurisdictional facts and should not reach the merits
of the case.” Wright, 137 S.W.3d at 251 n.10. This is because “ultimate liability in
tort is not a jurisdictional fact, and the merits of the cause are not at issue.” Glattly
v. CMS Viron Corp., 177 S.W.3d 438, 446 (Tex. App.—Houston [1st Dist.] 2005, no
pet.) (citing Wright, 137 S.W.3d at 251 n.10). “Rather, the purpose of a special
appearance is to determine whether the actions alleged by a plaintiff suggest that a
defendant should expect to be subject to jurisdiction in Texas.” Id. 
Verification of Special Appearance
          As a threshold matter, we address BP’s argument that the trial court properly
denied Todd’s special appearance because Todd’s special appearance was not
accompanied by a “properly sworn motion.” Todd attached an affidavit to his
original special appearance. While the affidavit stated that the “facts in this
Affidavit” were true and correct, it did not state that the facts in the special
appearance motion were true and correct. However, on January 29, 2004, four days
before the special appearance hearing, Todd amended his special appearance to
include a verification that stated that the facts alleged in his special appearance
motion were true and correct. Todd attached a blank order to his amended special
appearance motion, but there is no evidence in the record that the trial court signed
it. At the special appearance hearing on February 2, 2004, Todd asked for a ruling
on his amended motion, but the trial court did not rule on the amended motion. 
          A special appearance must be sworn. Tex. R. Civ. P. 120a(1); see also Casino
Magic Corp. v. King, 43 S.W.3d 14, 18 (Tex. App.—Dallas 2001, pet. denied). 
However, an unverified special appearance may be amended to cure the defect, even
after the trial court has ruled on the special appearance, as long as the amendment is
filed before the defendant enters a general appearance. See Tex. R. Civ. P. 120a(1);
Dawson-Austin, 968 S.W.2d at 322. Here, Todd amended his special appearance to
add a verification before the special appearance hearing and before he made a general
appearance. Todd was not required to obtain a ruling from the trial court on his
amended special appearance. Thus, Todd’s special appearance was properly verified.
Specific JurisdictionIn his sole issue in both cases, Todd argues that Texas has no specific
jurisdiction over him because he never purposefully directed his activities at Texas
residents. Todd asserts that “his actions on behalf of corporate entities are shielded
from serving as a basis for personal jurisdiction,” that BP and Empire have not
demonstrated facts concerning his participation in an alleged conspiracy, and that the
record contains no factual basis for asserting specific jurisdiction over him.


 
          Conversely, BP argues that Todd has sufficient minimum contacts with Texas
because he has committed torts in Texas. BP notes that the underlying lawsuit
involves claims against Todd for commission of various torts in Texas, including
negligent misrepresentations, fraud, fraudulent transfer, and conspiracy. BP further
asserts that it “adequately alleged jurisdictional facts to support its allegation of alter
ego.” Similarly, Empire notes that Todd is Westgate’s sole shareholder, that Todd
served as a significant source of capital for Westgate, that Todd approved of and
participated in the transfer of Westgate’s assets to 5E after receiving notice of BP’s
and Empire’s demands, and that Todd and Brent discussed the price Westgate would
receive for such assets. BP and Empire both assert that Brent and Todd purposefully
set this price low with the intent to defraud Westgate’s creditors, including BP and
Empire. 
          Initially, we note that Todd entered his special appearances as to the entire
proceedings in both the BP and the Empire cases, rather than as to any specific claims
asserted by BP and Empire that may have been severable. See Tex. R. Civ. P. 120a(1)
(“A special appearance may be made as to an entire proceeding or as to any severable
claim involved therein.”). Additionally, Todd did not assert separate jurisdictional
arguments in his trial court or appellate court briefing in regard to the separate claims
asserted by BP or Empire, and Todd did not argue that any claim asserted against him
was severable. Accordingly, if personal jurisdiction exists over Todd with respect to
any of the common claims asserted by BP and Empire, then we will hold that the trial
court properly denied Todd’s special appearances filed in both cases as to all claims. 
See Glattly, 177 S.W.3d at 450; see also Dechon v. Dechon, 909 S.W.2d 950, 955 &
n.5) (Tex. App.—El Paso 1995, no writ).
          BP and Empire commonly alleged against Todd in his individual capacity,
among other claims, fraud and fraudulent transfer arising out the sale of Westgate’s
assets to 5E after Westgate received demands from BP and Empire for payment of the
well’s drilling costs. Under the Texas Uniform Fraudulent Transfer Act (“TUFTA”),
“[a] transfer made or an obligation incurred by a debtor is fraudulent as to a creditor,
whether the creditor’s claim arose before or within a reasonable time after the transfer
was made or the obligation was incurred, if the debtor made the transfer or incurred
the obligation with actual intent to hinder, delay, or defraud any creditor of the
debtor.” Tex. Bus. & Com. Code Ann. § 24.005(a)(1) (Vernon 2002); SITQ E.U.,
Inc. v. Reata Rests, Inc., 111 S.W.3d 638, 647 n.8 (Tex. App.—Fort Worth 2003, pet.
denied). 
          Here, BP and Empire produced evidence that, at a minimum, Brent “consulted”
with Todd about the decision of Westgate, a Texas corporation, to sell its assets,
including the Mallet prospect, to 5E, another family-owned Texas corporation of
which Brent was the sole officer and director and Todd was the majority shareholder. 
The Mallet prospect, which was located in Texas, apparently was one of the primary
assets of Westgate. The evidence further established that these assets may have been
sold as a direct result of BP and Empire’s demands that Westgate pay its
proportionate share of drilling costs for the well located in Texas. BP and Empire
also produced evidence that Todd and Brent discussed Westgate’s affairs during their
monthly telephone conversations and that, during a telephone call placed from Texas
by Brent to Todd, Todd specifically advised his father that selling Westgate’s assets
might constitute a fraudulent conveyance because Westgate appeared to be “getting
rid” of its assets when it was being sued. Yet, despite Todd’s cautioning of Brent
concerning the legal implications of selling Westgate’s assets, Todd testified that he
ultimately agreed to the sale. Brent also testified that, along with the other family
shareholders of Westgate, Todd specifically consented to the sale of Westgate’s
assets. There is also testimony that Todd and Brent discussed the price for which
Westgate should sell its assets to 5E. The price, discussed during these
conversations, is central to BP’s and Empire’s claims that Westgate did not receive
reasonably equivalent value for its assets and that Todd and Brent intentionally sold
these assets for nominal compensation in order to avoid BP’s and Empire’s demands
for drilling costs. Accordingly, we hold that this evidence is sufficient to establish
that Todd has sufficient contacts with the state of Texas for the exercise of personal
jurisdiction over him to comport with due process. 
          In regard to Todd’s assertion that he is protected from the specific jurisdiction
of Texas courts under the “fiduciary shield doctrine,” we note that the doctrine
protects a corporate officer, agent, or employee from a trial court’s exercise of general
personal jurisdiction when all of the individual’s contacts with a forum state are on
behalf of the corporation. Wright, 137 S.W.3d at 250; SITQ E.U., Inc., 111 S.W.3d
at 650–51; Brown v. Gen. Brick Sales Co., 39 S.W.3d 291, 297–98 (Tex. App.—Fort 
Worth 2001, no pet.). Texas courts applying the fiduciary shield doctrine have
expressly limited its application to attempts to exercise general jurisdiction over a
nonresident defendant because it is well-settled that a corporate agent can be held
individually liable for fraudulent conduct. Wright, 137 S.W.3d at 250-51; Stern v.
KEI Consultants, Ltd., 123 S.W.3d 482, 488 (Tex. App.—San Antonio 2003, no pet.); 
SITQ E.U., Inc., 111 S.W.3d at 651; Brown, 39 S.W.3d at 300. The fiduciary shield
doctrine does not protect a corporate officer from specific personal jurisdiction as to
intentional torts or fraudulent acts for which he may be held individually liable. 
Glattly, 177 S.W.3d at 448; Wright, 137 S.W.3d at 250–51; Jackson v. Kincaid, 122
S.W.3d 440, 448 (Tex. App.—Corpus Christi 2003, pet. filed); SITQ E.U., Inc., 111
S.W.3d at 651. “It is not necessary that the ‘corporate veil’ be pierced in order to
impose liability, as long as it is shown that the corporate officer knowingly
participated in the wrongdoing.” Glattly, 177 S.W.3d at 448 (citing Barclay v.
Johnson, 686 S.W.2d 334, 337 (Tex. App.—Houston [1st Dist.] 1985, no writ)). 
Accordingly, we hold that the fiduciary shield doctrine is not available to Todd as a
defense to the trial court’s exercise of specific personal jurisdiction based on his
alleged individual tortious and fraudulent conduct. 
Traditional Notions of Fair Play and Substantial Justice
          The exercise of personal jurisdiction over a nonresident defendant must also
comport with traditional notions of “fair play and substantial justice.” Guardian
Royal, 815 S.W.2d at 228. The burden is on the defendant to present a compelling
case that the presence of some other considerations renders the exercise of
jurisdiction unreasonable. Id. at 231 (quoting Burger King, 471 U.S. at 477, 105 S.
Ct. at 2185). In making a determination, a court generally must look to the following
factors: “(1) the burden on the defendant; (2) the interests of the forum state in
adjudicating the dispute; (3) the plaintiff’s interest in obtaining convenient and
effective relief; (4) the interstate judicial system’s interest in obtaining the most
efficient resolution of controversies; and (5) the shared interest of the several states
in furthering fundamental substantive social policies.” Id. at 228, 231. “Only in rare
cases . . . will the exercise of jurisdiction not comport with fair play and substantial
justice when [a] nonresident defendant has purposefully established minimum
contacts with the forum state.” Id. at 231. Furthermore, distance from the forum is
generally not sufficient to defeat jurisdiction because the availability of “modern
transportation and communication have made it less burdensome for a party sued to
defend himself in a [s]tate where he engages in economic activity.” McGee v. Int’l
Life Ins. Co., 355 U.S. 220, 223, 78 S. Ct. 199, 201 (1957).
          Here, Todd contends that litigating in Texas would impose a “severe burden”
and would impose logistical difficulties. However, we note that likely witnesses,
including representatives from BP and Empire, as well as Brent, Todd’s father and
co-defendant, and Boone, Westgate’s alleged agent and Todd’s co-defendant, reside
in Texas, and that relevant documents held by Westgate, BP, and Empire concerning
the operation of the well and the parties’ agreements to pay drilling costs, may be
located in Texas. Furthermore, although it appears that defending this suit in Texas
might necessitate some travel and expense for Todd, these factors alone are not
determinative, see Guardian Royal, 815 S.W.2d at 231, and “there is no legal
requirement that this hardship must be borne instead by the plaintiff whenever the
defendant is not found in the state of the plaintiff’s residence.” Wright, 137 S.W.3d
at 253–54. Additionally, we note that it appears from the record that Todd makes
frequent trips to Texas and that he maintains a personal agent or representative in
Texas to evaluate investments and handle unspecified personal affairs. Accordingly,
we hold that the exercise of personal jurisdiction over Todd comports with traditional
notions of fair play and substantial justice. 
          Because the record indicates that Todd’s contacts with Texas are sufficient to
create specific jurisdiction over him and because the exercise of personal jurisdiction
over Todd comports with traditional notions of fair play and substantial justice, we
further hold that the trial court did not err in denying Todd’s special appearances in
both the BP case and the Empire case. Furthermore, having held that Texas courts
have specific jurisdiction over Todd with respect to the above claims, and because
Todd filed his special appearances as to the entire proceedings, we need not consider
whether specific jurisdiction existed as to other claims asserted by BP and Empire,
including allegations that jurisdiction is appropriate based on allegations of alter ego. 
See Glattly, 177 S.W.3d at 450. Finally, we also need not reach alternative arguments
concerning the lack of general jurisdiction. Id. 
          We overrule Todd’s sole issue.
 
Conclusion  We affirm the orders of the trial court denying Todd’s special appearances in
both the BP case and the Empire case.
 
 
                                                                        Terry Jennings
 
                                                                        Justice
 
 

Panel consists of Justices Jennings, Alcala, and Price.