Brad CAMAC, Appellant

v.

Jordan DONTOS, Jennifer Dontos, & Crave, LLC, Appellees.

No. 05–11–00765–CV.

Court of Appeals of Texas, Dallas.

April 17, 2012.

Rehearing Overruled June 12, 2012.

Sean Higgins, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, Houston, TX, John R. Henderson, Bank of America Plaza, Dallas, TX, for Appellant.

Gary E. Smith, Gary E. Smith, P.C., Dallas, TX, for Appellee.

Before Justices O'NEILL, FRANCIS, and MURPHY.

**OPINION**

Opinion By Justice MURPHY.

Brad Camac appeals the trial court's order denying his special appearance in a

franchise dispute filed against him and others by Jordan and Jennifer Dontos and Crave, LLC (collectively, the Dontoses).[1] We affirm the trial court's order.

## BACKGROUND

The underlying dispute involves a franchise agreement the Dontoses entered into with 24Seven Vending (USA) Limited, a New Zealand company, for vending machine routes located in Texas. Camac, a California resident, was the Vice President of Franchise Sales for 24Seven and handled the sale of the vending machine franchise in Texas to the Dontoses.

According to the Dontoses, they were promised two established vending machine routes within Farmers Branch and Carrollton, Texas, each of which was said to generate minimum average weekly gross sales of $6,730. The Dontoses borrowed $333,000 from a bank recommended by 24Seven, paid that amount plus a $175,000 deposit to 24Seven, quit their jobs, and moved from Seattle, Washington to Carrollton to manage their franchise. Ultimately, 24Seven did not tender the described routes, and instead, the Dontoses were asked to accept below-average sales routes that required greater driving distances between accounts. The Dontoses also later learned 24Seven was running into financial difficulty in the time just before they became franchisees and that 24Seven was to be sold to another company called Bacon Whitney Corporation. The Dontoses claim this information, as well as the availability of the promised routes, was either misrepresented or concealed from them.

Camac is one of ten defendants[2] the Dontoses sued alleging violations of the Federal Trade Commission franchise rule, 16 C.F.R. §§ 436.2, 436.9 (2004), the Texas Business Opportunity Act, Tex. Bus. & Com. Code Ann. § 51.301 (West 2009), the Deceptive Trade Practices–Consumer Protection Act, Tex. Bus. & Com.Code Ann. §§ 17.41–.926 (West 2011), and the Washington Franchise Investment Protection Act, Wash. Rev.Code Ann. § 19.100.170 (West 2008). The Dontoses also alleged causes of action for fraud, breach of the franchise agreement, and interference with contractual and business relationships. As to Camac, the Dontoses specifically alleged he was the "principal spokesman and actor" in the fraud perpetrated on them by the defendants.

Camac specially appeared and objected to the court's exercise of personal jurisdiction over him. Camac argued his only contacts with Texas arose out of his employment with 24Seven. Camac verified his special appearance in which he attested he never conducted business in Texas in his individual capacity, but rather, "any contacts [he] may have had with the State of Texas were on behalf of [his] former employer, 24Seven (USA) Limited." The Dontoses responded with an affidavit of Jordan Dontos, which they incorporated into their sixth amended petition. The trial court denied the special appearance, finding it had specific jurisdiction over Camac.[3] Camac appealed that ruling. *See*

1. Crave, LLC is a Texas limited liability company the Dontoses formed to enter into the vending machine franchise as described below.

2. The remaining defendants include 24Seven, VTL Group Limited, which was the parent or sister company of 24Seven, Vending Technology Limited, which is another company affiliated with 24Seven and VTL, Bacon Whitney, the bank that loaned the Dontoses the purchase money, and various individuals involved in the process. The other defendants are not parties to this appeal.

3. The Dontoses had alleged both general and specific jurisdiction. The transcript of the hearing is not part of the record before us.

TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(7) (West 2008) (interlocutory appeal).

## DISCUSSION

Camac raises several arguments in his single issue challenging the trial court's denial of his special appearance. Those include assertions the Dontoses' jurisdictional facts pleaded and contained in Jordan Dontos's affidavit are insufficient, that Camac did not purposefully avail himself of jurisdiction in Texas because his contacts were at the direction of his employer, there is no connection between the facts alleged and the operative facts of the case, and he negated the jurisdictional allegations. We conclude the trial court properly found it had specific jurisdiction over Camac and limit our analysis accordingly.

### Due Process

■■ Personal jurisdiction concerns a court's power to bind a particular person or party. *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996) (orig. proceeding). That power is grounded in constitutional guarantees of due process. Texas courts may exercise personal jurisdiction over a nonresident defendant if the Texas long-arm statute permits the exercise of jurisdiction and the assertion of jurisdiction is consistent with federal and state constitutional due process guarantees. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex.2010). The requirements of the Texas long-arm statute are considered satisfied if the exercise of personal jurisdiction is consistent with federal due process limitations. *Id.*

■■ The due process clause of the federal constitution permits a court to ex-ercise personal jurisdiction over a nonresident defendant only when the defendant has "established minimum contacts with the forum state, and the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex.2007) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Minimum contacts are established when the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex.2005). The defendant's conduct and connection with the state must be such that it could reasonably anticipate being sued in the forum state. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex.2002).

### Standards & Burdens

■■ The question of whether a trial court has personal jurisdiction over a nonresident defendant is one of law that we review de novo. *Kelly*, 301 S.W.3d at 657. When, as here, the trial court does not issue findings of fact or conclusions of law in support of its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. *Moki Mac*, 221 S.W.3d at 574; *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex.2002).

In its order, the trial court stated it reviewed the pleadings and affidavits filed, as well as considered arguments of counsel. The affidavits are part of our record. The Dontoses' sixth amended petition was the live pleading at the time of the trial court's ruling on Camac's special appearance.

A defendant claiming it is not amenable to process in Texas must file a verified special appearance challenging the trial court's exercise of jurisdiction. *See* Tex.R. Civ. P. 120a; *Petrie v. Widby*, 194 S.W.3d 168, 174 (Tex.App.-Dallas 2006, no pet.). The plaintiff bears the initial burden of pleading jurisdictional facts sufficient to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Kelly*, 301 S.W.3d at 658. The plaintiff's pleadings and its response to the special appearance may be considered in determining whether the plaintiff satisfied its burden. *Flanagan v. Royal Body Care, Inc.*, 232 S.W.3d 369, 374 (Tex. App.-Dallas 2007, pet. denied). The nonresident defendant then carries the burden of negating all bases of personal jurisdiction alleged by the plaintiff. *Kelly*, 301 S.W.3d at 658.

The defendant can negate jurisdiction on either a factual or legal basis. *Id.* at 659. A factual attack requires the defendant to present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. *Id.* The plaintiff then responds with its own evidence that affirms its allegations. *Id.* In a legal attack on specific jurisdiction, the defendant takes the defendant's factual allegations as true. Under this challenge, the defendant may prevail by showing (1) those assumed facts are insufficient to establish jurisdiction, (2) the defendant's Texas contacts fall short of purposeful availment, (3) the claims do not arise from the contacts, or (4) traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction. *Id.*

## Specific Jurisdiction

A defendant's contacts with a forum can give rise to either specific or general jurisdiction. *BMC Software*, 83 S.W.3d at 795–96. Specific jurisdiction is established if the defendant's alleged liability arises from or is related to the defendant's contacts with the state. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex.2010). When specific jurisdiction is alleged, the minimum-contacts analysis focuses on the relationship among the defendant, the litigation, and the forum. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex.2009); *Moki Mac*, 221 S.W.3d at 575–76. This analysis requires the court to review whether (1) the defendant purposefully availed itself of the privilege of conducting activities in the forum state and (2) whether the operative facts of the litigation bear a substantial connection to the defendant's contacts with the state. *Moki Mac*, 221 S.W.3d at 578–79. If both these requirements are met, we then must determine if the exercise of specific jurisdiction over the nonresident defendant comports with traditional notions of fair play and substantial justice. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano Cnty.*, 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

## Analysis

Camac argues the trial court erred in denying his special appearance as to specific personal jurisdiction because (1) he did not purposefully avail himself of jurisdiction in Texas because his contacts were at the direction of his employer, (2) the Dontoses did not meet their pleading burden of alleging facts showing Camac committed a tort in Texas, and the facts alleged have no connection to the operative facts of the case, and (3) he negated the Dontoses' jurisdictional allegations, and Jordan Dontos's opposing affidavit is conclusory and speculative.

The court determines a special appearance based on the pleadings and any stipulations, affidavits, and other evidence relevant to the jurisdictional dispute.

TEX.R. CIV. P. 120a(3); *Kelly*, 301 S.W.3d at 658 n. 4; *Flanagan*, 232 S.W.3d at 374. In this case, the record consists of the Dontoses' sixth amended petition, Camac's verified special appearance, the affidavit of Jordan Dontos, and Camac's supplemental affidavit. We begin with Camac's argument the Dontoses failed to meet their pleading burden.

### The Dontoses' Initial Burden to Plead Jurisdictional Facts

█ Camac asserts the Dontoses' allegations against him are "conclusory" and fail to state "facts showing that Camac committed a tort in the state of Texas." As such, he is assuming the truth of the allegations and is attempting to negate jurisdiction on a legal basis. *See Kelly*, 301 S.W.3d at 659.

The Dontoses alleged that Camac committed tortious acts in Dallas County, Texas. Specifically, they pleaded the following jurisdictional allegations as to Camac:

[Camac] is an individual residing and working, at all material times, through the 24Seven offices in Dallas County, Texas. *He is or was at all material times, Vice President of Franchise Sales for [24Seven] and the principal spokesman and actor for [24Seven]* . . . *in the perpetration of the "shell game" that is the gravamen of this suit.* He was in charge of sales at the Dallas office of 24Seven. *He met with [the Dontoses], in Dallas, on several occasions and communicated with them on a constant and systematic basis by email and phone both to and from Dallas, Texas.[ ] The first meeting was March 2, 2007, before [the Dontoses] had entered into any agreements with any of the Defendants.* At that time, he knew or should have known that 24Seven was in dire financial straits, that it was in or near receivership and that the Routes were not available. He had a duty to pass this information on to [the Dontoses] but failed to do so. Had he done so, [the Dontoses] would not have entered into the Agreement or paid the initial $175,000. *He met with [the Dontoses], in Dallas, after they had entered into the Agreement and paid the $175,000 but before the final closing on August 31, 2007. At that time, he represented that Routes 116 and 117 were available when he knew or should have known they were not and represented that the acquisition by Bacon Whitney was a "good deal" because it was adequately funded and that Bacon Whitney would take over the Texas franchises, including [the Dontoses'].* Based upon a reasonable reliance on these material representations, [the Dontoses] closed and paid the rest of the money and incurred the bank loan. All of these statements were material to [the Dontoses'] decisions and none of them were true. *These tortuous [sic] acts of fraud were committed in Dallas County, Texas* and are sufficient specific minimum contacts with the State of Texas to confer personal jurisdiction on Camac in a Texas court; put Camac on fair notice that he could be sued in Texas as required by traditional notions of fair play and substantial justice and the U.S. Constitution and the laws of the State of Texas. Also, his title, duties and apparent authority and constant presence in Texas as "Head of Sales" of the Dallas Office constitutes sufficient general contact with the State of Texas to confer personal jurisdiction on Camac in a Texas court; put Camac on fair notice that he could be sued in Texas as required by the traditional notions of fair play and substantial justice and the U.S. Constitution and the Laws of the State of Texas. Both the specific and general

contacts described above are, separately and in tandem, purposeful, continuous, systematic and longstanding. The Affidavit of Jordan Dontos, filed concurrently herewith, is incorporated herein by reference.

(Emphasis added).

The referenced affidavit of Jordan Dontos, which was incorporated into the sixth amended petition, included attestations that:

(1) "Jennifer and I moved to Dallas on July 3, 2007. *From then until closing, [we] were in constant contact with Camac, by both phone and email. He was handling the sale of the franchise to us.*"

(2) *"Before July 3rd, he called us and emailed us from Dallas. He told us that 'I am in Dallas all the time'. After July 3rd, we were in Dallas and all of the calls and emails came to us in Dallas. Some of them were from him, in Dallas.* He seemed anxious to hurry the closing and we got the impression that he needed to get it closed to collect his commission."

(3) "After being informed by a fellow franchisee that 24/Seven was being sold to Bacon Whitney, *I immediately contacted Camac (via phone from Dallas) with questions and concerns as to 1) why we were never made aware of the sale and 2) the potential impact it would have on our business, which we were being pressured (by Camac) to close as fast as possible. He was not forthcoming with any details about the sale, but assured us that it was good for us because [Halpert & Denny, the financial backers for Bacon Whitney] were very well-funded so we wouldn't have to deal with the financial or processing deficiencies of 24/Seven.* He presented it as a more attractive alternative to 24/Seven—as if we were getting out of a bad deal—which was more alarming given the fact we were never under the impression there was anything wrong with 24/Seven to begin with."

(4) *"After that phone call, we met Camac at the company warehouse in Dallas. Again he indicated the sale was best for everyone without giving any specifics. Just that we'd be better off because they would be able to better focus on the franchise model and franchisee needs, as well as obtain more clients and routes to sell. We went to dinner that evening and at the bar, while we waited for a table, I again tried to get information about the sale and Camac tried to avoid the subject by simply offering the same re-assurance that the sale was nothing but positive and not to worry."*

(5) "If Camac had given us any information it would have changed our decision to move forward with the deal. He never indicated that the sale would not even include our franchise as an asset, (in fact, to the contrary, he lead us to believe it would) that we weren't even really part of the same group in Dallas even though we were managed as such, and he certainly never told us of the financial difficulties at 24/7 at any point in the sales process."

(6) *"When he met with [us] in Dallas, the second time, after we had entered into the Agreement and paid the $175,000 but before the final closing on August 31, 2007, he again represented that Routes 116 and 117 were available when he*

*knew or should have known they were not and represented that the acquisition by Bacon Whitney was a 'good deal' because it was adequately funded and that Bacon Whitney would take over the Texas franchises, including our Franchise."*

(7) *"Also, he told us his title, duties and apparent authority were as "Head of sales" for the Dallas Office."*

(8) "Because of his position with the 24/Seven, Brad Camac knew or should have known that these Routes were not available and of the financial condition of the VTL Group, 24Seven and Bacon Whitney."

(9) *"Brad Camac was instrumental in obtaining and closing this loan through emails and phone calls made from and to Dallas, Texas.* The loan was set to close on August 30 but it was delayed (by Camac) until August 31. The reason for the delay, we found out later, was the transfer from 24/Seven to Bacon Whitney."

(Emphasis added).

■■■ Camac asserts the allegations are vague and conclusory because the Dontoses did not set forth any facts to support the allegations. For example, he contends that although the Dontoses alleged they were not told in the March 2007 meeting that 24Seven was facing financial difficulties, he argues they did not allege facts substantiating that claim that 24Seven was actually in such condition. He further contends they did not allege facts demonstrating Camac had a duty to tell them 24Seven was in financial trouble or that the routes were unavailable. Even if Camac were correct, his complaints go to the merits of the Dontoses' claims. And in reviewing an order denying a special appearance, we are not concerned with the merits of the plaintiff's claims. *See Michiana,* 168 S.W.3d at 790–91.

The Dontoses were required to plead sufficient allegations to bring Camac within the reach of Texas's long-arm statute. *See Kelly,* 301 S.W.3d at 658. Based on the specific allegations described above that Camac committed tortious acts in Texas by misrepresenting the routes the Dontoses were acquiring as franchisees in Texas, the meetings in Texas at which the allegedly fraudulent statements were made, the constant and systematic calls and e-mails to and from Texas regarding the acquisition, the reliance by the Dontoses on those representations by acquiring substantial debt and leaving their home and moving to Texas, and Camac's role as the principal spokesman and actor in the "perpetration of the 'shell game' that is the gravamen" of the lawsuit, we conclude the Dontoses satisfied their initial burden— even if we do not consider the affidavit incorporated into the pleading. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042(2) (West 2008) (allowing personal jurisdiction for any tort committed "in whole or in part" in Texas). We therefore overrule Camac's sole issue to that extent.

### Substantial Connection

■■■ Camac also argues he is not subject to the jurisdiction of the trial court because the allegations have no connection to the operative facts of the case. This argument also assumes the truth of the allegations and is a legal challenge to the second requirement for specific jurisdiction: whether Camac's liability arises from or relates to his Texas contacts. *Moki Mac,* 221 S.W.3d at 579. In making this determination, we focus our analysis on the relationship among the defendant, the litigation, and forum. *Id.* at 575–76.

The Dontoses claim as to Camac that he was the "principal spokesman and actor" in the fraud perpetrated on them by all ten defendants. They specifically rely on alleged representations and omissions by Camac during meetings in Texas: (1) in the March 2007 meeting with the Dontoses in Dallas, Camac misrepresented the availability of the promised routes and did not tell them 24Seven was facing financial difficulties; (2) in the meeting in Dallas before their closing in August 2007, the Dontoses alleged Camac again misrepresented the availability of the routes and the specifics regarding 24Seven's acquisition by Bacon Whitney (that the acquisition was a "good deal" and that Bacon Whitney would take over their franchise) and did not tell them relevant information about the acquisition (such as, that Bacon Whitney would not be taking over their franchise but would be collecting their franchise fees). Based on those allegations, the Dontoses assert causes of action for federal and state franchise disclosure rule violations, DTPA violations, fraud, breach of the franchise agreement, and interference with contractual or business relationships.

In arguing the Dontoses' liability theories are unrelated to the operative facts, Camac goes through each cause of action separately. He maintains: (1) the facts do not set forth a violation of the FTC franchise rule, the business opportunity act, or DTPA; (2) any violation of the Washington franchise act necessarily occurred in that state and not Texas; (3) the allegations do not amount to fraud because the Dontoses must show the representations were material and were made knowingly or recklessly; (4) there is no allegation Camac was a party to the franchise agreement; and (5) the Dontoses alleged no act of interference by Camac. He asserts the Dontoses' "allegations against Camac are an attempt to establish personal jurisdiction, not a cause of action."

We observe first that we need not address each cause of action separately in conducting a "relatedness" analysis because all of the Dontoses' claims are based on the same forum contacts. *See Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 26 (Tex.App.-Houston [1st Dist.] 2010, no pet.). Additionally, Camac's arguments go to the merits of the Dontoses' claims-that is, whether causes of action have been pleaded or can exist on the facts alleged. At the special appearance stage, the merits of a claim are not at issue, and we do not determine whether any claim asserted is viable. Rather, in determining whether the Dontoses' claims arise from or relate to Camac's Texas contacts, we look for a connection between those claims and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d at 585. The operative facts are those that will be the focus of the trial. *See id.; see also Pulmosan Safety Equip. Corp. v. Lamb*, 273 S.W.3d 829, 839 (Tex.App.-Houston [14th Dist.] 2008, pet. denied). Here, the relevant focus is the Dontoses' allegations Camac was the main actor in the fraudulent "shell game" perpetrated on them.

This point is to be distinguished from the conclusion reached by a panel of this Court in *Dontos v. Bruno*, 339 S.W.3d 777 (Tex.App.-Dallas 2011, no pet.). Mark Bruno was another of the ten defendants sued by the Dontoses. Bruno was the president of Bacon Whitney and met with the Dontoses and other Texas franchisees in Dallas in November 2007 to evaluate the Texas franchises before Bacon Whitney determined which ones to take over. *Id.* at 779. Bruno filed a special appearance, which was granted, and this Court affirmed because the Dontoses "fail[ed] to establish any substantive connection between Bruno's contacts with Texas and the operative facts of the litigation." *Id.* at

781. In reaching this conclusion, the Court emphasized that neither Bruno nor Bacon Whitney were parties to the franchise agreement and did not play any role in inducing the Dontoses to enter into the agreement or buy the routes or franchise from 24Seven. *Id.*

Unlike the allegations against Bruno, the Dontoses alleged Camac, through false representations and omissions, encouraged them ultimately to close on the deal. Thus, the focus at trial will be the role he played in inducing them to enter into the franchise agreement and purchase the vending machine routes, as well as the effect his statements had on their decision to move forward with the deal. We therefore conclude the operative facts of the Dontoses' claims are substantially connected to Camac's Texas contacts and overrule his issue to that extent.

### Camac's Burden to Negate All Bases of Personal Jurisdiction

Once the Dontoses met their pleading burden, it became Camac's burden of negating, with evidence, all bases of personal jurisdiction alleged by the Dontoses. *See Kelly*, 301 S.W.3d at 658. He argues he did that. We therefore look to his verified special appearance and supplemental affidavit to evaluate Camac's contention.

In his special appearance, Camac argued the Dontoses failed to allege "any specific contacts between Camac and Texas" and asserted the fiduciary shield doctrine protected him from personal jurisdiction in Texas because his only contacts arose "solely in his capacity as an employee" of 24Seven, the Dontoses' franchisor. The only bases Camac verified to negate personal jurisdiction were that he (1) was a resident of California, (2) did not maintain a physical address, post office box, telephone number, or bank account in Texas, and (3) "in his individual capacity" (a) had not engaged in business in Texas, (b) did

not maintain a place of business in Texas, (c) did not have employees or agents in Texas, (d) had not availed himself of the benefits and privileges of conducting activities in Texas, (e) had not committed a tort in Texas, and (f) did not own, lease, or rent real property or other assets in Texas. In his supplemental affidavit, Camac averred further that (1) all his dealings with the Dontoses were in his capacity as an employee or officer of 24Seven, (2) he never acted in his individual capacity in any dealings, transactions, communications, meetings, correspondence, conversations, "or the like" with the Dontoses, (3) he had not entered into any contracts or agreements with the Dontoses in his "individual capacity," (4) he had not received any money from the Dontoses, (5) he was a salaried employee of 24Seven and did not work on a commission basis or receive any money for execution of the franchise agreement, and (6) "[d]uring the relevant time period referred to" in Jordan Dontos's affidavit and in the petition, he worked in the 24Seven office in Los Angeles, and not in Texas.

In short, Camac provided verification that he had no individual contacts with Texas and everything he did was as an employee or officer of 24Seven. Significantly, he did not negate any of the Dontoses' allegations and evidence that he was in constant contact with the Dontoses in Texas by phone and e-mail, he misrepresented the promised routes, he assured them Bacon Whitney was well-funded, he failed to advise them of the financial and processing deficiencies of 24Seven, he met with them in Dallas, he "told" them his title and duties with 24Seven were as "Head of Sales" for the Dallas office, and he handled the Dontoses' purchase of the Texas franchise. He further admits that he was the Vice President for 24Seven's Franchise Sales.

■ It is only when a plaintiff fails to plead jurisdictional allegations that a nonresident defendant can satisfy its burden simply by presenting evidence that it is a nonresident. *See id.* at 659 & n. 5. Because the Dontoses satisfied their pleading burden, Camac had to do more than show he was a nonresident in order to negate all bases for jurisdiction. Camac failed to do so—rather, he asserted he is not liable because his actions were as an officer and employee of 24Seven. We therefore consider whether he can insulate himself from the Dontoses' allegations of personal jurisdiction on that basis.

■ In his special appearance, Camac cites the fiduciary shield doctrine as the basis for negating personal jurisdiction; on appeal, he asserts simply that the contacts he made in his corporate capacity should not count against him for purposes of personal jurisdiction when he is sued individually. The fiduciary shield doctrine is based on the principle that "jurisdiction over an individual cannot be based upon jurisdiction over a corporation." *Nichols v. Tseng Hsiang Lin,* 282 S.W.3d 743, 750 (Tex.App.-Dallas 2009, no pet.). Thus, a nonresident corporate officer or employee is protected from the trial court's exercise of general jurisdiction over him when his only contacts with Texas were made on behalf of his employer. *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 438 (Tex.1982) ("Absent some allegation of a specific act in Texas, or one with reasonably foreseeable consequences within this state's borders, a nonresident employee of a foreign corporation cannot be sued in

Texas simply because his or her employer solicits business here.").

■ But one's status as an employee does not necessarily insulate him from jurisdiction. *See Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). The doctrine does not protect a corporate officer or employee from a trial court's exercise of specific jurisdiction as to intentional torts or fraudulent acts for which he may be held individually liable. *Wright v. Sage Eng'g, Inc.,* 137 S.W.3d 238, 250 (Tex.App.-Houston [1st Dist.] 2004, pet. denied); *SITQ E.U., Inc. v. Reata Rests., Inc.,* 111 S.W.3d 638, 651 (Tex. App.-Fort Worth 2003, pet. denied). Instead, it is well settled that a corporate agent or officer may be held personally liable for fraudulent statements or knowing misrepresentations, even when the statements or representations are made in his capacity as a corporate representative. *Wright,* 137 S.W.3d at 250. Thus, under those principles, a nonresident who travels to Texas and makes purportedly fraudulent statements is subject to specific jurisdiction in Texas. *Petrie,* 194 S.W.3d at 175; *Stein v. Deason,* 165 S.W.3d 406, 415 (Tex.App.-Dallas 2005, no pet.).

Here, having failed to refute the Dontoses' allegations (and related evidence) of his purportedly fraudulent statements, Camac has failed to negate all bases for the Texas court's exercise of specific jurisdiction as to his acts. That Camac's actions may have been taken on behalf of 24Seven only does not alter the jurisdictional inquiry. Accordingly, we overrule Camac's issue to the extent he contends he negated the Dontoses' jurisdictional allegations as to specific jurisdiction.[4]

---

4. Accordingly, we do not need to analyze further Camac's complaint Jordan's affidavit was defective because it was not made on personal knowledge, did not set forth facts that would be admissible in evidence, and did not show that Jordan was competent to testify.

He further characterized Jordan's affidavit as conclusory and lacking foundation. Camac cites several statements in which he claims Jordan either "failed to set forth the factual basis for his statements" or did not explain how he knew the information. We observe,

### Purposeful Availment

Finally, Camac argues he did not purposefully avail himself of jurisdiction in Texas. Minimum contacts with the forum state are established when the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson*, 357 U.S. at 253, 78 S.Ct. 1228. There are three aspects to our "purposeful availment" inquiry. *See Michiana*, 168 S.W.3d at 785. First, only the defendant's contacts with the forum state count, not the unilateral activity of another. *Id.* Second, the contacts relied upon must be "purposeful," rather than "random, isolated, or fortuitous." *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). Third, the nonresident defendant must "avail" himself of the jurisdiction by seeking some benefit, advantage, or profit. *Id.* ("Jurisdiction is premised on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there.").

Within the context of the special appearance proceeding, Camac offered no evidence refuting the Dontoses' claims as alleged and as attested in Jordan's affidavit about the financial state of 24Seven, the availability of the promised routes, and the specifics of the Bacon Whitney acquisition. Significantly, Camac does not dispute that the alleged misrepresentations and omissions were made in Texas. Rather, Camac contends his contacts "resulted from the decisions of his employer, 24Seven" and "were in the course of his employment by 24Seven, for the purpose of performing 24Seven's business."

As described above, the fiduciary shield doctrine does not protect a corporate officer or employee from a trial court's exercise of specific jurisdiction as to intentional torts or fraudulent acts for which he may be held individually liable. *Wright*, 137 S.W.3d at 250; *SITQ*, 111 S.W.3d at 651. Camac did not address the purposefulness of his Texas contacts or deny he made the representations or failed to disclose information. Nor did he refute the Dontoses' statements they would not have entered into the agreement had they known the truth or received the omitted information. Camac asserts only that "any contacts [he] may have had with the State of Texas were on behalf of [his] former employer, 24Seven (USA) Limited." In that context and in response to Jordan's statement in his affidavit he and his wife "got the impression [Camac] needed to get [the purchase] closed to collect his commission," Camac denied in his supplemental affidavit that he received a commission for the transaction with the Dontoses.

Applying the three parts of our "purposeful availment" inquiry to this record, we conclude Camac has not shown he negated the Dontoses' allegations he purposefully availed himself of benefits of the forum. The first two points are inapplicable—it is Camac's contacts that are being counted, and they are not "random, isolated, or fortuitous." *Michiana*, 168 S.W.3d at 785. He admits he was the Vice President of Franchise Sales for 24Seven. As to the third question of whether Camac

---

however, that beyond the affidavit recital that the statements were made based on Jordan's personal knowledge, the facts in the affidavit showed the statements were made based on his personal meetings and communications with Camac. Camac's arguments regarding details of Camac's knowledge and the meet-

ings and other communications go to proof. As described above, the allegations and supporting affidavit statements were sufficient for purposes of the Dontoses' jurisdictional allegations, and Camac did not refute those statements.

"availed" himself of the forum's laws or protection by seeking some benefit, advantage, or profit, the fact that he did not receive a "commission" on the Dontoses' sale is not conclusive. He has not denied that as an officer in charge of franchise sales it was to his personal advantage or benefit to complete the transaction, especially at a time when the company was in dire financial straights according to the Dontoses' allegations.

Regardless of whether the Dontoses' claims have merit or whether Camac ultimately is held liable for the actions he performed in connection with his employment with 24Seven, Camac's contacts with Texas are sufficient to satisfy the jurisdictional requirement that he purposefully availed himself of the laws of Texas. And he reasonably could have anticipated being sued in Texas for the consequences of misrepresentations or omissions in connection with those franchise contacts. *See Petrie*, 194 S.W.3d at 175 (nonresident who travels to Texas and makes purportedly fraudulent statements is subject to specific jurisdiction in Texas); *Deason*, 165 S.W.3d at 415 (same). The Dontoses' allegations were sufficient to support the trial court's implied finding that Camac purposefully established minimum contacts with Texas to support specific jurisdiction.

### Fair Play and Substantial Justice

 Once minimum contacts sufficient to support jurisdiction are established, we must consider these contacts in light of other factors to determine whether the trial court's assertion of personal jurisdiction over a nonresident defendant would offend traditional notions of fair play and substantial justice. *See Asahi Metal Indus. Co.*, 480 U.S. at 113. In making this determination, we look to (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *Id.; Spir Star AG*, 310 S.W.3d at 878. Camac bears the burden of presenting " 'a compelling·case that the presence of some consideration would render jurisdiction unreasonable' " to defeat jurisdiction. *Spir Star AG*, 310 S.W.3d at 879 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex.1991)).

Although he generally asserted in the trial court that the "assumption of jurisdiction" over him would "offend traditional notions of fair play and substantial justice" and would deprive him of "the right to due process," he made no argument as to why the trial court's exercise of jurisdiction would be unfair. And on appeal, Camac has offered no authority or argument as to the factors we must consider in making the determination of whether the trial court's assertion of jurisdiction over him would offend notions of fair play and substantial justice; he does not address this part of our analysis at all in his opening brief or reply brief. When a party fails to adequately brief a contention, he presents nothing for our review. Tex.R.App. P. 38.1(i); *Devine v. Dallas Cnty.*, 130 S.W.3d 512, 512–14 (Tex.App.-Dallas 1999, pet. denied). Accordingly, we conclude Camac did not meet his burden.

Even if Camac had presented something for us to review, once a court determines that a nonresident defendant has purposefully established minimum contacts, only in "rare cases" will the exercise of jurisdiction not comport with fair play and substantial justice. *Deason*, 165 S.W.3d at 415 (citing *Guardian Royal*, 815 S.W.2d at 231). This is not such a rare case. *See Petrie*, 194 S.W.3d at 176; *Deason*, 165 S.W.3d at 415.

## CONCLUSION

Based on our review of the pleadings and affidavits, we conclude Camac had contacts with Texas out of which the Dontoses' claims arose. Consequently, the trial court properly denied Camac's special appearance. We affirm the trial court's order and overrule Camac's sole issue.