

# NUMBER 13-21-00014-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

WADI PETROLEUM, INC.,
DICE EXPLORATION COMPANY, INC.,
SOUTH BAY CORPORATION,
LAMB OIL & GAS, INC., AND
BETACO, LLC,                                                    Appellants,

v.

ETHAN MILLER,                                                    Appellee.

On appeal from the 459th District Court
of Travis County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Silva**
**Memorandum Opinion by Justice Benavides**

In this oil and gas dispute, appellants Wadi Petroleum, Inc. (Wadi), Dice Exploration Company, Inc., South Bay Corporation, Lamb Oil & Gas, Inc., and Betaco, LLC appeal from the trial court's order granting appellee Ethan Miller's special

appearance.[1] In what we construe as a single issue, appellants contend that the trial court may exercise specific jurisdiction over Miller as to appellants' unintentional and intentional tort claims against him. We affirm in part and reverse and remand in part.

## I. BACKGROUND

In 2004, appellants and other working interest owners acquired leases and began operations on what would eventually become nine oil and gas wells and saltwater disposal wells located in southern Louisiana. The wells were operated under five separate joint operating agreements (JOAs[2]), which generally require each working interest owner to contribute a proportional share to the costs of operations in return for a proportional share of the net revenues. Among the working interest owners, one is designated as the operator of the wells.

The operator is responsible for the exploration, development, and production of the wells and must provide an accounting of the costs and revenues to the other working interest owners. In particular, under the JOAs, the "Operator shall bill Non-Operators on or before the last day of each month for their proportionate share of the Joint Account for the preceding month," and each bill "will be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate classifications of investment and expense." Additionally, in the event a

---

[1] This appeal was transferred from the Third Court of Appeals in Austin pursuant to a docket-equalization order rendered by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 74.001.

[2] The JOAs were signed in 2004, 2005, 2006, 2007, and 2008, and each one concerns a separate oil and gas lease.

working interest owner does not receive its share of the revenues directly from a purchaser, the operator is responsible for remitting the proportional shares to each owner.

Under the JOAs, notice "shall be given in writing by mail or telegram, Federal Express or other courier services, postage or charges prepaid, or by fax or telecopier and addressed to the parties to whom the notice is given at the addresses listed" in an exhibit attached to the JOAs. Many of the parties to the JOAs, including appellants, have Texas addresses and phone and fax numbers listed for purposes of notice.

Operators receive additional compensation. For example, under the 2007 JOA, the operator, "[a]s compensation for administrative, supervision, office services and warehousing costs," was entitled to charge the joint account at the monthly rate of $12,000 for drilling wells and $1,200 for producing wells. Under the 2008 JOA, the same monthly rates were set at $10,000 and $1,000, respectively.

The first three JOAs originally designated Wadi, a Texas corporation, as the operator[3] and "Louisiana Delta Oil Company, LLC" as a non-operating working interest owner. The final two JOAs, executed in 2007 and 2008, respectively, designated "Louisiana Delta Oil Company, LLC" as the operator and Wadi as a non-operating working interest owner.[4]

According to Miller, "Louisiana Delta Oil Company, LLC" is a Virginia limited liability

---

[3] Brammer Engineering, Inc. was designated as the agent operator for Wadi under these JOAs.

[4] Appellants South Bay Corporation, Lamb Oil & Gas, Inc., and Betaco, LLC are parties to some, but not all, of the JOAs as minor non-operating working interest owners. Appellant Dice Exploration Company, Inc. is not a named working interest owner under any of the JOAs in the record.

company that he formed with Phil Bryant Jr., a Texas resident.[5] Miller and Bryant elected to establish the company's principal place of business in Texas for sixteen years, first in Houston, and then in Lakeway. Bryant served as the company's president. Miller, a licensed attorney residing in Virginia, served as its chief financial officer and chief legal officer. Bryant, along with the company's geological and accounting staff, oversaw the daily operations of the oil and gas wells from the company's Texas office. Miller traveled to the company's corporate office between ten and nineteen times from 2001 until 2015 in his capacity as a manager and owner of the company. Miller maintained the company's books concerning revenues at his office in Virginia and was responsible for remitting revenues to the other working interest owners. In 2016, Bryant resigned as president, and Miller moved the company's principal place of business to Virginia.

At this point, the company had become the operator under all five JOAs. Operations under the first three JOAs were transferred to the company after Miller traveled to Houston in 2010 to meet with representatives of Wadi at their office. When Bryant resigned in 2016, the other working interest owners disagreed on whether Miller's company should continue to serve as operator. Miller began lobbying the other owners, culminating in a May 2016 meeting in Houston between the owners.

---

[5] Contrary to Miller's representations about his company's place of incorporation, the first four JOAs were signed by Phil Bryant Jr. and include an acknowledgement by Bryant that "he is the Manager of LOUISIANA DELTA OIL COMPANY LLC, *a Texas limited liability company*, and that the forgoing instrument was signed on behalf of said company by authority of its Managers." (Emphasis added). The record reflects that there are two companies with the same name, one incorporated in Texas, and one incorporated in Virginia. We accept as true Miller's statements that it was the Virginia company that was a party to the JOAs.

In an affidavit, Kirk Dice, Vice President and co-owner of Wadi and Dice Exploration Company, Inc., said that Miller organized the May 2016 meeting in Houston and that "Miller made certain representations about himself and his companies that turned out to be untrue." In particular, Kirk said that Miller "told [him] that his companies were professional oil and gas operations companies[,] and [that] they would operate the wells strictly in accordance with the law, the [JOA]s in place, and COPAS standards of performance and conduct." Kirk contends that Miller's representations about "professional experience and acumen" proved untrue and that Kirk's companies relied on those representations to their detriment by deciding to do business with Miller's companies. Kirk alleged that "[d]uring the course of operations, Mr. Miller and his companies made charges for operations that did not take place" and overcharged for other operations that benefited Miller personally. Kirk believes Miller "defrauded [his] companies, and other working interest owners, by his lack of truthfulness, over-billing, and general incompetence in operations of the wells at issue." Kirk's brother, Kevin, also a principal owner of Dice Exploration Company, Inc. and Wadi, provided a substantively identical affidavit.

In 2018, appellants filed suit against Miller, Bryant, "Louisiana Delta Oil Co., LLC – Texas" (LDOC-Texas), "Louisiana Delta Oil Co., LLC – Virginia" (LDOC-Virginia), and others. The petition includes the following allegations:

> Defendants, including, but not limited to Defendants Bryant and Miller, have engaged in the following unlawful acts, among others, either while physically present in Texas or by intentionally directing communications to Texas residents:

5

a. failed to account for and falsely reported natural gas that was produced by the subject wells and sold by Defendants, then failed to render and falsely reported to the working interest owners their share of revenues therefrom;

b. failed to maintain and falsified the books and records of expenditures and revenues from the wells;

c. acquired interests in the wells beyond their original investments without offering the other working interest owners their contractual rights to participate in those acquisitions;

d. allowed interest owners, for instance Combined Resources and Nakoma Petroleum, to sell their interests but retain rights in the audit and uphole potential in the sold wells in violation of the terms of the Joint Operating Agreements (JOAs) and exploration agreements;

e. set up unauthorized escrow accounts in which revenues from the wells are being improperly "held hostage" from the working interest owners;

f. held funds obtained from paid AFEs, and then failed to account for those funds or use them for their intended purposes and falsely reported same to the working interest owners;

g. assigned interests in the wells without notifying the other working interest owners and without including in the assignments important language required by the JOAs;

h. failed to account for condensates that were produced by the subject wells and falsely reported same to the working interest owners;

i. failed to account for or deliver to Plaintiffs their share of revenues from the subject wells and falsely reported same to the working interest owners;

j. charged unconscionable, far-above-market rates for the rental of equipment and barges owned by Defendants and others, and falsely reported same to the working interest owners, and then allowed the barges to come into disrepair damaging not only the barges but damaging or causing the loss of equipment located thereon;

6

k. sold oil, gas, and other production from the wells without accounting for it and without providing the net revenues received from its sale to the working interest owners and falsely reported same to the working interest owners;

l. operating the wells poorly resulting in prior and current DNR issued civil penalties for non-compliance; two recent citations issued 12/9/2016 and 1/10/2017;

m. failed to maintain equipment in a workable manner thereby requiring replacement equipment acquired by Defendants from their own companies at above-market rates;

n. operated the wells in a substandard manner to negatively impact the fair market value of the wells, effectively holding Plaintiffs' interests hostage, while the asset values depleted, and falsely reported same to the working interest owners;

o. failed to respond timely to outstanding audit claims exceeding $5 million and allowed required equipment and NAV lights to stop working, risking fines from government authorities; and

p. continue to assign interest in wells without including the necessary State language thereby negating the assignments as null and void.

Miller filed a special appearance, and over the course of the next two years, both sides conducted jurisdictional discovery, including taking the depositions of Miller and Bryant, among others. Appellants amended their petition to include the following jurisdictional allegations against Miller specifically:

Defendant Miller has made at least two in-person visits to Texas in which he met with representatives of [appellants.] During those visits, and through other communications made through mail and email, Miller made various statements to [appellants] that were false, fraudulent, and misleading, or failed to state facts that he knew and that were relevant to [appellants'] interests and that he had a fiduciary duty to disclose, in an effort to encourage [appellants] to stay involved in the ventures, including false statements or silence relating to accounting for the wells, leasing of equipment for the wells, and other related topics as described above.

7

On October 1, 2020, the trial court conducted the special appearance hearing and took the matter under advisement. On November 19, 2020, appellants filed their third amended petition, alleging for the first time that the corporate defendants were the alter egos of the individual defendants.

On December 4, 2020, after considering, among others, "the pleadings on file," the trial court granted Miller's special appearance. This interlocutory appeal ensued. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7).

## II. STANDARD OF REVIEW & APPLICABLE LAW

### A. Standard of Review

"A court must have both subject matter jurisdiction over a case and personal jurisdiction over the parties to issue a binding judgment." *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 7–8 (Tex. 2021); *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871 (Tex. 2010). Personal jurisdiction involves a court's ability to bind a particular party to that judgment. *Luciano*, 625 S.W.3d at 8; *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996). A special appearance allows a nonresident to appear in a Texas court for the limited purpose of challenging the court's exercise of personal jurisdiction. *See* TEX. R. CIV. P. 120a(1).

Whether a trial court may exercise personal jurisdiction over a nonresident defendant is a question of law we review de novo. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016) (citing *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002)). In resolving this legal question, the trial court may be required to

8

decide questions of fact. *Luciano*, 625 S.W.3d at 8; *Am. Type Culture Collection*, 83 S.W.3d at 806. "When, as here, the trial court does not issue findings of fact and conclusions of law with its judgment, we presume all factual disputes were resolved in favor of the trial court's decision unless they are challenged on appeal." *Luciano*, 625 S.W.3d at 8; *see Old Republic Nat'l Title Ins. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)).

## B. Personal Jurisdiction

Under Texas's long-arm statute, Texas courts may exercise personal jurisdiction over a nonresident defendant that "does business" in Texas. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042; *PHC-Minden, L.P., v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 166 (Tex. 2007). A nonresident "does business" in Texas if, among other things, it contracts with a Texas resident and either party performs the contract in whole or in part in Texas or the nonresident commits a tort in whole or in part in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(1), (2). During the special appearance hearing, Miller conceded that appellants' pleading alleged facts that satisfied this definition.

However, because the exercise of personal jurisdiction over a nonresident implicates due process concerns, the Texas long-arm statute reaches only "as far as the federal constitutional requirements of due process will permit." *PHC-Minden*, 235 S.W.3d at 166 (quoting *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)); *see Goodyear Dunlop Tires Operations, S.A., v. Brown*, 564 U.S. 915, 918 (2011) ("A state court's assertion of jurisdiction exposes defendants to the State's coercive power, and is

therefore subject to review for compatibility with the Fourteenth Amendment's Due Process Clause." (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945))). Accordingly, in addition to its own decisions, the Supreme Court of Texas relies on personal jurisdiction precedent from the United States Supreme Court and other federal courts. *PHC-Minden*, 235 S.W.3d at 166.

The exercise of personal jurisdiction satisfies due process if (1) the nonresident defendant established minimum contacts with the forum state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* (citing *Int'l Shoe*, 326 U.S. at 316). When a nonresident defendant purposefully avails itself of the privileges and benefits of conducting business in a foreign jurisdiction, its contacts are sufficient to confer the forum with personal jurisdiction over the defendant. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013) (citing *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). Only the defendant's purposeful contacts are relevant to the inquiry; unilateral activity of another party or third person, as well as random, isolated, or fortuitous contacts by the defendant, are insufficient to prove the defendant purposefully availed itself of the forum. *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 70 (Tex. 2016) (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)).

Once minimum contacts have been established, the exercise of jurisdiction will typically comport with traditional notions of fair play and substantial justice. *Spir Star*, 310 S.W.3d at 878 (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays,*

*P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991)). To establish the contrary, the defendant must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Id.* at 879 (quoting *Guardian Royal*, 815 S.W.2d at 231). Those considerations include: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* at 878 (citing *Guardian Royal*, 815 S.W.2d at 231).

A defendant's contacts with the forum can give rise to either general or specific jurisdiction. *Cornerstone Healthcare*, 493 S.W.3d at 71. The central inquiry under specific jurisdiction is the relationship between the defendant, the forum state, and the plaintiff's claim. *Id.* (citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575–76 (Tex. 2007)). General jurisdiction, on the other hand, does not require a nexus between the defendant's in-state contacts and the plaintiff's claim; instead, the focus is solely on the defendant's contacts with the forum. *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 (1984) (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952)); *PHC-Minden*, 235 S.W.3d at 168.

Specific jurisdiction is appropriate when the plaintiff's claim arises from or relates to the defendant's contacts with the forum state. *Cornerstone Healthcare*, 493 S.W.3d at 71 (citing *Spir Star*, 310 S.W.3d at 873). To satisfy this requirement, "there must be a

11

substantial connection between those contacts and the operative facts of the litigation." *Old Republic*, 549 S.W.3d at 560 (citing *Moki Mac*, 221 S.W.3d at 585).

The plaintiff bears the initial burden of alleging facts that establish the trial court's jurisdiction. *Searcy*, 496 S.W.3d at 66 (citing *Republic Drilling*, 278 S.W.3d at 337). The burden then shifts to the defendant to negate all bases for personal jurisdiction that exist in the plaintiff's pleading. *Id.* (citing *Republic Drilling*, 278 S.W.3d at 337). If the defendant disproves the plaintiff's jurisdictional allegations, then the plaintiff should present evidence in support of the petition's allegations. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010). In a specific jurisdiction analysis, "we must analyze the defendant's contacts 'on a claim-by-claim basis' to determine whether each claim arises out of or is related to the defendant's minimum contacts." *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016) (quoting *Moncrief Oil*, 414 S.W.3d at 150).

## III. ANALYSIS

The sole issue before us is whether Miller's contacts with Texas are sufficient to confer the trial court with specific jurisdiction over him as to appellants' various tort claims. As a preliminary matter, the parties dispute which contacts, if any, should be considered in our jurisdictional analysis.

### A. Fiduciary Shield Doctrine Does Not Apply

First, Miller contends that all his relevant contacts with Texas were in a representative capacity, and therefore, under the fiduciary shield doctrine, those contacts cannot be imputed to him personally. Generally, the fiduciary shield doctrine protects a

12

nonresident corporate officer or employee from the exercise of personal jurisdiction when all his contacts with Texas were made in a representative capacity. *Tabacinic v. Frazier*, 372 S.W.3d 658, 668 (Tex. App.—Dallas 2012, no pet.). However, courts applying the fiduciary shield doctrine "have limited its application to attempts to exercise *general* jurisdiction over a nonresident." *Id.* (collecting cases).

Conversely, a nonresident corporate officer is not shielded from the exercise of specific jurisdiction as to torts for which the officer may be held individually liable. *Cagle v. Clark*, 401 S.W.3d 379, 390–91 (Tex. App.—Texarkana 2013, no pet.); *Tabacinic*, 372 S.W.3d at 668; *SITQ E.U., Inc. v. Reata Rests., Inc.*, 111 S.W.3d 638, 651 (Tex. App.—Fort Worth 2003, pet. denied). "Thus, a corporate officer is not protected from the exercise of specific jurisdiction, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct directed at the forum state for which he may be held personally liable." *Cagle*, 401 S.W.3d at 391; *Tabacinic*, 372 S.W.3d at 668–69.

Here, appellants have limited their contract claims to the corporate defendants but alleged torts against Miller for which he can be held individually liable. *See Tabacinic*, 372 S.W.3d at 668 ("Corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation."); *Shapolsky v. Brewton*, 56 S.W.3d 120, 133 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (same). Thus, the fiduciary-shield doctrine does not protect Miller from the exercise of specific jurisdiction in this case

13

if personal jurisdiction is otherwise proper. *See Cagle*, 401 S.W.3d at 391; *Tabacinic*, 372 S.W.3d at 668–69; *SITQ E.U.*, 111 S.W.3d at 651.

**B.      Alter Ego Theory Does Not Apply**

Next, appellants argue the corporate defendants are Miller's alter egos; therefore, in addition to Miller's individual contacts, we should impute the contacts of the corporate defendants—all of which admittedly do business in Texas—to Miller. As previously mentioned, appellants raised this allegation for the first time in an amended petition that was filed after the special appearance hearing but before the trial court's ruling. The parties dispute whether this amended pleading was the "live pleading" when the trial court granted the special appearance. Even assuming the alter ego theory was properly considered by the trial court, we cannot conclude that it applies here.

"[T]he party seeking to ascribe one corporation's actions to another corporation or individual for jurisdictional purposes by piercing the corporate veil must prove the alter ego relationship." *Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 482 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *BMC*, 83 S.W.3d at 798); *Wilmington Tr., Nat'l Ass'n v. Hsin-Chi-Su*, 573 S.W.3d 845, 855 (Tex. App.—Houston [14th Dist.] 2018, no pet.). As support for their alter ego allegation, appellants have not pointed us to any evidence in the jurisdictional record. *See* Tex. R. App. P. 38.1(i) (requiring parties to support their contentions "with appropriate citations to authorities and to the record"). Instead, appellants only cite to the alter ego allegations in their petition, the entirety of which are set out below:

14

[Appellants] assert that the individual Defendants[6] used the corporate structures of the corporate Defendants as shells and false fronts for operations carried out by, and for the benefit of, the individual Defendants, and thereby perpetrated frauds and other tortious conduct, ignored corporate formalities, and otherwise abused the legitimate purpose of corporate structures such that all actions by the corporate Defendants should be attributed to the individual Defendants under the doctrine of alter ego.

These conclusory allegations alone are insufficient to pierce the corporate veil for jurisdictional purposes. *See Booth v. Kontomitras*, 485 S.W.3d 461, 483 (Tex. App.—Beaumont 2016, no pet.) (finding conclusory allegations, without supporting evidence, insufficient to establish alter ego for jurisdictional purposes). Moreover, although fraud is necessary to pierce the corporate veil for purposes of liability, it "has no place in assessing contacts to determine jurisdiction." *PHC-Minden*, 235 S.W.3d at 175 (citing TEX. BUS. ORGS. CODE ANN. § 21.223). Rather, courts consider evidence of (1) commingled funds, (2) representations that the individual would financially back the companies, (3) the diversion of company profits to the individual for his personal use, and (4) other failures to keep company and personal assets separate. *Booth*, 485 S.W.3d at 483; *Nichols v. Tseng Hsiang Lin*, 282 S.W.3d 743, 747 (Tex. App.—Dallas 2009, no pet.) (citing *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 229 (Tex. 1990)). Having failed to point us to any such evidence, appellants have not established that all the contacts of Miller's companies should be imputed to Miller. Accordingly, we turn to the nature and quality of Miller's individual contacts with Texas.

---

[6] We note that there were four "individual Defendants" named in the suit—Miller, Bryant, Bryant's wife, and a bookkeeper that worked for LDOC-Virginia at their office in Lakeway, Texas.

15

## C.    Purposeful Availment

In a similar vein to his argument regarding the fiduciary shield doctrine, Miller contends that any of his contacts with Texas benefited his companies, not him personally, and consequently, he did not purposefully avail himself of the privileges of conducting business within Texas. We disagree.

First, Miller owned an interest in LDOC-Texas, a Texas limited liability company with its principal office in Texas, for approximately one year.[7]  Soon after, he and Bryant, a Texas resident, formed LDOC–Virginia, with each person owning a 50% interest in the company. Although the company was incorporated in Virginia, Miller and Bryant elected to establish its principal place of business in Texas for sixteen years, first in Houston, and then in Lakeway. This is where the company's staff worked, Bryant served as the company's President, and Miller visited between ten and nineteen times from 2001 until 2015 in his capacity as a manager and owner of the company. These contacts with Texas were not the unilateral action of some third party, and they cannot be characterized as random, isolated, or fortuitous. *See Touradji v. Beach Cap. P'ship*, 316 S.W.3d 15, 30–31 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (finding a nonresident defendant "purposefully directed his activities towards Texas" where, among other contacts, he agreed to serve as a manager of a Texas entity); *TexVa, Inc. v. Boone*, 300 S.W.3d 879, 888 (Tex. App.—Dallas 2009, pet. denied) (finding nonresident defendants' contacts with

---

[7] Miller states in an affidavit filed with his special appearance that he has "never been a member of, nor had any interest in, [LDOC-Texas]." During his deposition, however, Miller admitted that he did own an interest in the company but disclaimed that he was a founding member or manager. Bryant, on the other hand, testified that Miller was a founding member and manager of LDOC-Texas.

16

Texas "were a direct result of their voluntary decisions and actions" where they formed a Texas corporation with a Texas resident who performed some corporate functions in Texas, even though the corporation was headquartered in California and conducted most of its operations in California). Additionally, Miller acknowledged that he "often" communicated with appellants by email and attended meetings with Wadi representatives in Texas in 2007 and 2016 to discuss his company becoming, and then continuing as, the operator under the JOAs. *See Moki Mac*, 221 S.W.3d at 577 ("Examples of additional conduct that may indicate whether a defendant purposefully availed itself of a particular forum include . . . establishing channels of regular communication to customers in the forum state.").

Further, LDOC-Virginia formed five joint ventures with various Texas corporations. Each of these Texas corporations made capital contributions that made the joint ventures possible, culminating in $103 million in net revenues distributed among the working interest owners, according to Miller. Thus, Miller's suggestion that he did not personally benefit from the success of his company through its contacts with Texas is unavailing.[8] *See TexVa*, 300 S.W.3d at 889 (concluding "[nonresident defendants] clearly sought to profit from their ongoing business relationship with [a Texas resident] through formation of a Texas corporation"); *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 23 (2d Cir. 1988) ("Fick and Janeski, through SCI, reached into New York to obtain the benefits of

---

[8] Miller is also a member manager of several limited liability companies that received royalty payments as owners of the leased properties.

17

selling seven franchises to be operated in the state. As officers, directors, and shareholders, they stood to benefit from this entry into the New York market.").

Finally, although Miller downplays the significance of his longstanding business ties to Texas, Miller was actively involved in a company that was domiciled in Texas for sixteen years, during which it maintained ongoing business relationships with several Texas corporations. Beyond visiting the corporate office in Texas and regularly communicating with other working interest owners located in Texas, Miller served as the company's chief financial officer and chief legal officer. As chief financial officer, Miller was the recordkeeper for revenues generated by the wells, and he reported those revenues to the other working interest owners in Texas, including remitting their proportional share of the net revenues. Given all these activities purposefully directed at Texas, Miller had fair warning that disputes arising out of or related to the JOAs may subject him to the jurisdiction of Texas. *See Schlobohm v. Schapiro*, 784 S.W.2d 355, 359 (Tex. 1990) ("Schapiro became actively involved in a Texas business and voluntarily continued his commitment for almost two years. He was investor, stockholder, director, advisor, lender, and guarantor for Hangers. He visited the state and maintained regular communications with some of its citizens. When we consider the degree of his involvement, we regard it difficult to believe that anyone in Schapiro's position could have been surprised by the call to litigation in Texas.").

18

We conclude that Miller purposefully availed himself of the privilege of conducting business in Texas. We must next address whether the claims against Miller arose out of or were related to his contacts with the state.

## D.      Substantial Connection

Miller argues that there is no substantial connection between his Texas contacts and the operative facts of the litigation. *See Old Republic*, 549 S.W.3d at 560 (citing *Moki Mac*, 221 S.W.3d at 585). Rather, Miller submits that all acts and omissions giving rise to appellants' claims occurred in either Louisiana or Virginia, and thus, there is not a sufficient relationship between his forum contacts and appellants' claims. Because appellants have alleged two main categories of claims against Miller—unintentional and intentional torts—that rely on different contacts with Texas, we address each category in turn. *See TV Azteca*, 490 S.W.3d at 37.

### 1.      Unintentional Torts

Appellants have brought claims against both Bryant and Miller for negligence and gross negligence, alleging they "operated the wells in a substandard manner" and "failed to maintain equipment in a workable manner," causing appellants' interests in the wells and equipment to depreciate. We conclude there is no substantial connection between these claims and Miller's contacts with Texas.

In *Moki Mac*, parents sued a Utah-based river-rafting outfitter for wrongful death and negligent and intentional misrepresentation after their son died on a river-rafting trip in Arizona. 221 S.W.3d at 573. The Supreme Court of Texas found that, by advertising in

19

Texas, the company purposefully availed itself of the benefit of conducting business in the state. *Id.* at 579. However, the court ultimately determined that there was not a substantial connection between those advertisements, which contained the alleged misrepresentations, and the operative facts of the litigation:

> Certainly on a river rafting trip safety is a paramount concern, and we accept as true the Druggs' claim that Andy might not have gone on the trip were it not for Moki Mac's representations about safety. However, the operative facts of the Druggs' suit concern principally the guides' conduct of the hiking expedition and whether they exercised reasonable care in supervising Andy. The events on the trail and the guides' supervision of the hike will be the focus of the trial, will consume most if not all of the litigation's attention, and the overwhelming majority of the evidence will be directed to that question. Only after thoroughly considering the manner in which the hike was conducted will the jury be able to assess the Druggs' misrepresentation claim.

*Id.* at 585.

Similarly, appellants' negligence claims are principally concerned with conduct that occurred in Louisiana, where the wells are located, and whether the operator and its representatives exercised reasonable care in managing those assets. *See id.* Events in Louisiana will consume most if not all of the litigation's attention, and the overwhelming majority of the evidence will be directed to what occurred there. *See id.*

Appellants have failed to identify which of Miller's Texas contacts they contend are sufficiently connected to these claims. To the extent they rely on Miller's two meetings in Texas where he advocated for his company to become, and then continue as, the operator, the connection between these meetings and appellants' claims seems to hinge on a but-for analysis (i.e., but for his company becoming and continuing as the operator,

20

Miller would not have had the opportunity to mismanage the operation), which the supreme court has rejected in the jurisdictional inquiry. *See Old Republic*, 549 S.W.3d at 561 (citing *Moki Mac*, 221 S.W.3d at 581 (deciding that a "but-for test" is "too broad and judicially unmoored to satisfy due-process concerns")). To the extent they rely on the fact that the wells were supervised from the company's corporate office in Texas until 2016, the uncontroverted evidence in the record establishes that Bryant was responsible for overseeing daily operations from Texas before Miller took over and moved the corporate office to Virginia. Moreover, we have already rejected appellants' contention that the Texas contacts of Miller's companies should be imputed to him personally. Without a sufficient nexus between Miller's personal Texas contacts and appellants' negligence claims, the trial court did not err when it granted Miller's special appearance as to these claims. We overrule appellants' issue in part.

### 2. Intentional Torts

But this is not a case where all relevant conduct occurred in Louisiana or Virginia and merely affected parties with connections to Texas. *See Walden v. Fiore*, 571 U.S. 277, 291 (2014). As the United States Supreme Court has explained, although certain claims may be substantially connected to one forum, "[a] different State's courts may yet have jurisdiction, because of another 'activity [or] occurrence' involving the defendant that takes place in the State." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, __ U.S. __, 141 S. Ct. 1017, 1026 (2021) (quoting *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cnty.*, 582 U.S. __, __, 137 S.Ct. 1773, 1780–81 (2017)).

As LDOC-Virginia's Chief Financial Officer, Miller testified that he maintained the financial records for the revenues generated by the oil and gas wells at his office in Virginia, but, consistent with the terms of the JOAs, he mailed statements and revenue checks to appellants at their offices in Texas beginning in 2007. In 2016, after Bryant resigned and Miller moved the company's headquarters to Virginia, Miller also began accounting for the operation's expenses by sending monthly billing statements to appellants at their offices in Texas. Appellants' intentional tort claims are principally based on Miller's alleged overreporting of expenses and underreporting of revenues. Although the validity of these claims will be tested against what actually occurred in Louisiana, we conclude the alleged misrepresentations are sufficiently connected to Texas to satisfy due process.

Miller contends that any alleged misrepresentations occurred in Virginia, but appellants received and relied on the representations in Texas. *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 653 (Tex. 2018) (listing elements of fraud). To be sure, a false statement cannot support a claim for fraud unless "the plaintiff actually and justifiably relied upon the representation and suffered injury as a result." *Id.* (citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins.*, 51 S.W.3d 573, 577 (Tex. 2001)). Thus, although Miller's "actionable conduct" may have occurred partly outside of Texas, it caused harm within the state. *See TV Azteca*, 490 S.W.3d at 53–54 (noting that, in *Moki Mac*, "the actionable conduct occurred and caused harm outside of the forum state, so the defendant's liability arose from conduct outside of the forum state"). Regardless,

appellants' intentional tort claims arose directly from Miller's repeated and ongoing contacts with the State through his reporting and accounting obligations to Texas residents under the JOAs. Stated differently, Miller's contacts "form the basis of the cause[s] of action." *Old Republic*, 549 S.W.3d at 560 (citing *Moki Mac*, 221 S.W.3d at 585). As such, appellants' intentional tort claims are sufficiently connected to Miller's Texas contacts.

## E.    Traditional Notions of Fair Play and Substantial Justice

Miller has not argued in the trial court or in this Court that exercising personal jurisdiction over him in Texas would offend traditional notions of fair play and substantial justice. *See Spir Star*, 310 S.W.3d at 878 (citing *Guardian Royal*, 815 S.W.2d at 231). Because he has failed to present "a compelling case that the presence of some consideration would render jurisdiction unreasonable," we conclude that the exercise of jurisdiction will comport with traditional notions of fair play and substantial justice. *Id.* at 879 (quoting *Guardian Royal*, 815 S.W.2d at 231). Accordingly, the trial court erred when it granted Miller's special appearance as to appellants' intentional tort claims. We sustain appellants' issue in part.

## IV.    CONCLUSION

We reverse the trial court's order granting Miller's special appearance concerning appellants' claims for fraud, breach of fiduciary duty, conversion, and money had and received.[9] We affirm the trial court's order in all other respects. We remand this case to

---

[9] Appellants have also alleged a civil conspiracy between all defendants, both corporate and individual, but "civil conspiracy is a theory of vicarious liability and not an independent tort." *Agar Corp. v.*

23

the trial court for further proceedings.

GINA M. BENAVIDES
Justice

Delivered and filed on the
30th day of September, 2021.

---

*Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).